952 So.2d 368 (2006)
Cynthia MEINHARDT
v.
SAAD'S HEALTHCARE SERVICES, INC.
SAAD'S Healthcare Services, Inc.
v.
Cynthia Meinhardt.
2040192.
Court of Civil Appeals of Alabama.
March 17, 2006.
Certiorari Quashed September 15, 2006.
*370 John R. Spencer, Mobile, for appellant/cross-appellee Cynthia Meinhardt.
Ian D. Rosenthal and Joseph D. Stutz of Cabaniss, Johnston, Gardner, Dumas & O'Neal, LLP, Mobile, for appellee/cross-appellant SAAD's Healthcare Services, Inc.
Alabama Supreme Court 1050883.

On Application for Rehearing
PER CURIAM.
The opinion of November 18, 2005, is withdrawn, and the following is substituted therefor.
Cynthia Meinhardt sued her employer, SAAD'S Healthcare Services, Inc. ("SAAD'S"), seeking workers' compensation benefits under the Workers' Compensation Act, § 25-5-1 et seq., Ala.Code 1975 ("the Act"), based on "severe physical and psychological" injuries she sustained after being stabbed repeatedly while working in the line and scope of her employment at SAAD'S. SAAD'S answered and admitted that Meinhardt had sustained injuries arising out of and in the course of her employment.[1]
*371 Following an ore tenus proceeding, the trial court entered a judgment on August 23, 2004, finding that Meinhardt had suffered a permanent and total disability. However, the trial court declined to award Meinhardt permanent and total disability benefits based on its finding that Meinhardt had unreasonably refused to accept medical services, including both psychological and psychiatric care. In light of that finding, the trial court found that Meinhardt had sustained a 90% physical impairment to her body as a whole and that, as a result of her physical and psychological injuries, Meinhardt had a 90% vocational disability. The trial court determined that Meinhardt had reached maximum medical improvement ("MMI") with regard to her psychological injuries on May 1, 2004. A postjudgment motion filed by Meinhardt pursuant to Rule 59, Ala. R. Civ. P., was subsequently denied. Meinhardt appealed, and SAAD'S cross-appealed.
Meinhardt was employed by SAAD'S as a home-health-care nurse; she began working for SAAD'S in July 2001.[2] On March 7, 2002, Meinhardt visited the home of an elderly patient. Meinhardt testified that, after leaving the home, the patient's grandson called her cellular telephone and asked her to come back into the home. According to Meinhardt, she was attempting to talk on a telephone in the home when the grandson viciously attacked her. Meinhardt was stabbed over 47 times. Among the worst injuries she sustained from the assault were a cut to her jugular vein and the collapse of her right lung. Meinhardt spent one week in the hospital. After being discharged from the hospital, Meinhardt underwent two months of physical therapy. In physical therapy, Meinhardt worked on improving the use of her hands, right shoulder, and right arm. The parties stipulated before trial that Meinhardt had reached MMI with regard to her right shoulder on June 25, 2002, and that Meinhardt had reached MMI with regard to the remainder of her physical injuries on September 13, 2002.[3]
At trial, Meinhardt testified that she continued to have pain in her right arm and shoulder as well as pain in her right lung that she described as "cramps." Meinhardt explained that the pain from her injuries limited her activity. According to Meinhardt, she can cook and do light housework, but she must rely on her children to do the majority of the work around the house.
Meinhardt testified that she began to receive mental-health counseling approximately two months after the assault to address problems she had with nightmares and depression. Meinhardt first sought treatment on April 22, 2002, from Dr. Jake Epker, a psychologist. Meinhardt testified that she attended two or three counseling sessions with Dr. Epker before leaving his care because she "felt uncomfortable with him." While under the care of Dr. Epker, Meinhardt was referred to a psychiatrist, Dr. Marilyn Hammond, who prescribed Meinhardt medication to treat her depression and post-traumatic stress *372 disorder ("PTSD"). At Meinhardt's request, Dr. Hammond referred her to Dr. Melissa Ogden, a psychologist practicing in the same office as Dr. Epker. Meinhardt testified that she attended seven counseling sessions with Dr. Ogden. According to Meinhardt, she felt that her depression and overall mood had improved while she was in counseling. Meinhardt last saw Dr. Ogden for treatment in October 2002. Meinhardt testified that she stopped seeing Dr. Ogden because she felt better.
Meinhardt testified that in November 2002 Dr. Hammond released her to return to work and that she immediately returned to work in the office of SAAD'S. Meinhardt testified that she cried while at work and that hearing a telephone ring at work upset her. Meinhardt worked intermittently over a two-week period before quitting her job. Meinhardt has not worked since November 2002.
Meinhardt testified that in February 2004 she sought treatment from Dr. William Wilkerson; at that time, Meinhardt had not taken medication or received mental-health counseling for approximately one year. Meinhardt testified that she returned for treatment after experiencing problems with persistent crying, restless nights, and major depression. According to Meinhardt, her condition when she saw Dr. Wilkerson was no worse than when she initially sought treatment in 2002. Meinhardt testified that Dr. Wilkerson prescribed Remeron, an antidepressant, and that the medication has helped "some." Meinhardt testified that she still suffers from depression. According to Meinhardt, in 2004 she had not sought medical treatment for any of her physical problems but had only sought treatment for her mental condition.
Dr. Hammond testified by deposition that she initially diagnosed Meinhardt with acute PTSD and major depression in June 2002. Dr. Hammond testified that she discussed with Meinhardt her diagnosis and explained the benefits of taking medication and participating in counseling. According to Dr. Hammond, she made it clear to Meinhardt that individual psychotherapy was necessary for the treatment of PTSD and in order for Meinhardt to make any improvement. Dr. Hammond prescribed Serzone, an antidepressant, to Meinhardt. Dr. Hammond testified that Meinhardt's initial prognosis was good given Meinhardt's compliance with treatment.
Dr. Hammond testified that Meinhardt's mental condition improved over the course of her treatment. During a September 23, 2002, session with Dr. Hammond, Meinhardt rated her mood as an 8 on a scale of 1 to 10, with 10 being the best possible rating. Dr. Hammond noted after that session that Meinhardt was stable and planned to return to work. On November 4, 2002, Meinhardt again rated her mood as an 8 on a scale of 10. Dr. Hammond testified that she released Meinhardt to return to work at that time. According to Dr. Hammond, Meinhardt had improved and was not showing any symptoms of PTSD or depression. Dr. Hammond testified that Meinhardt agreed that it was time to return to work.
On February 25, 2003, Dr. Hammond met with Meinhardt again and Meinhardt reported that her condition had worsened. Dr. Hammond testified that Meinhardt told her that she had quit taking her medication in November because "she thought she would be okay without [it]" and that she had quit attending counseling sessions. According to Dr. Hammond, this reaction was not uncommon, but, nevertheless, she was astounded that Meinhardt had stopped taking her medication. Meinhardt also informed Dr. Hammond that she had quit her job. Dr. Hammond testified that *373 she immediately prescribed Meinhardt an antidepressant after learning this information.
On March 13, 2003, Meinhardt returned to Dr. Hammond for treatment. At that time, Meinhardt had been taking an antidepressant but had not yet returned to participate in counseling. Meinhardt rated her mood a 1 out of a possible 10. Dr. Hammond described Meinhardt's condition in March 2003 as "very poor." According to Dr. Hammond, Meinhardt's functional level had deteriorated because Meinhardt had stopped taking her medication and attending counseling sessions. Meinhardt missed follow-up appointments with Dr. Hammond in April and May.
Meinhardt testified that she stopped seeing Dr. Hammond for treatment in March 2003 because she believed that she was not progressing under Dr. Hammond's care. Meinhardt testified that she stopped taking her medication when she stopped seeing Dr. Hammond. Although Meinhardt admitted that her condition had improved while she was on the medication, she testified that she stopped taking the medication because "she felt like she was well." On cross-examination, Meinhardt admitted that her condition declined after she stopped taking her medication and attending counseling sessions. Meinhardt acknowledged that Dr. Hammond had emphasized the necessity of taking the medication and participating in counseling and that Dr. Hammond had warned her of the risks associated with not continuing the treatment. Meinhardt testified that Dr. Hammond encouraged her to return to therapy and to take her medication because, without them, her mental condition would worsen. Meinhardt further testified that Dr. Hammond had explained that her failure to take her medication would likely result in permanent problems. Meinhardt testified that after she stopped seeing Dr. Hammond in March 2003, she received numerous calls from her workers' compensation case manager encouraging her to return to Dr. Hammond for treatment or to seek treatment from another mental-health-care professional.
In a May 15, 2003, letter to Teresa Hamby, a workers' compensation case manager assigned to Meinhardt's case, Dr. Hammond expressed her concern over Meinhardt's deteriorated condition. Dr. Hammond noted that Meinhardt's PTSD and depression appeared much worse. In her letter, Dr. Hammond stated that she "believe[d] this could have been totally avoided had [Meinhardt] stayed on her medications and in therapy."
Dr. Hammond testified that in the spring of 2003 her medical opinion regarding Meinhardt's treatment was that medications would have improved Meinhardt's mental condition. Dr. Hammond explained that there were risks to taking Serzone, the antidepressant prescribed to Meinhardt, but that the risks were "fairly small." Dr. Hammond testified that Serzone can cause liver failure but that that generally occurs in the first two weeks to six months of treatment. Dr. Hammond testified that she had monitored Meinhardt for side effects while she was taking the drug and had found no adverse effects to Meinhardt's liver.
Dr. Hammond testified that the longer a patient is sick or depressed, the harder the patient's condition is to treat. According to Dr. Hammond, if PTSD goes untreated, the condition can become chronic. Dr. Hammond testified that she could not predict how successful Meinhardt's treatment would be after Meinhardt began taking her medication and attending counseling sessions for a second time. Dr. Hammond testified that she did not think Meinhardt had reached MMI at any time during her mental-health treatment. According to *374 Dr. Hammond, Meinhardt cannot move towards reaching MMI without receiving the appropriate treatment.
After going without treatment for nearly one year, Meinhardt was referred to Dr. Wilkerson, a psychiatrist, for a "workers' compensation evaluation." Dr. Wilkerson testified by deposition that his initial evaluation of Meinhardt on February 27, 2004, revealed that she suffered from chronic PTSD and major depression; he recommended further treatment. Dr. Wilkerson explained that Meinhardt suffered from chronic PTSD because she had been suffering from PTSD for more than six months. After his evaluation of Meinhardt, Dr. Wilkerson recommended that she return to counseling and begin taking her antidepressant medication again. At Meinhardt's next visit on April 8, 2004, Dr. Wilkerson prescribed Remeron, an antidepressant. Meinhardt reported to Dr. Wilkerson a third time on May 6, 2004; Dr. Wilkerson noted Meinhardt's condition had improved. During her June 10, 2004, visit with Dr. Wilkerson, Meinhardt reported that she had had two panic attacks. At that visit, Dr. Wilkerson changed Meinhardt's prescription antidepressant to Zoloft. Dr. Wilkerson last saw Meinhardt on July 15, 2004. According to Dr. Wilkerson, Meinhardt's condition at that time had deteriorated somewhat, and, as a result, he had adjusted her medication.
Dr. Wilkerson testified that, even with treatment, Meinhardt continues to suffer symptoms of depression and PTSD, and will likely suffer some degree of symptoms for the foreseeable future. Dr. Wilkerson acknowledged that Meinhardt's condition improved somewhat with treatment but opined that Meinhardt had reached a plateau in her treatment. Dr. Wilkerson testified that he did not believe that Meinhardt would be able to return to any type of gainful employment given the nature of her injuries and her continuing symptoms. Dr. Wilkerson placed Meinhardt at MMI "around [Meinhardt's] second [April 8, 2004,] or third [May 6, 2004,] visit" to his office for treatment.
On May 18, 2004, Dr. Joseph Law, Jr., a psychologist, evaluated Meinhardt. Dr. Law testified that Meinhardt had complained that she suffered from panic attacks, depression, and nightmares. After administering several psychological tests, reviewing Meinhardt's medical records, and interviewing Meinhardt, Dr. Law diagnosed Meinhardt with PTSD and depression. Dr. Law testified that Meinhardt had reached a plateau in her treatment and that the focus is now on helping her live with her condition. Dr. Law testified that Meinhardt would not be a good candidate to participate in a vocational program or a job-placement program. According to Dr. Law, Meinhardt possesses the skills necessary to work but is unable to focus because of her anxiety and her related ongoing mental-health problems. On cross-examination, Dr. Law noted that discontinuing treatment such as counseling and medication for months and then returning later for treatment seriously compromises the treatment process.
Before addressing the issues raised by the parties on appeal, we note that when this court reviews a trial court's factual findings in a workers' compensation case, those findings "will not be reversed if [they are] supported by substantial evidence." § 25-5-81(e)(2), Ala.Code 1975. In light of that principle of review, "`the trial court's findings on disputed evidence in a workers' compensation case are conclusive,'" and this court must not "`weigh the evidence before the trial court.'" Ex parte Golden Poultry Co., 772 So.2d 1175, 1176 (Ala.2000) (quoting Ex parte Ellenburg, 627 So.2d 398, 399 (Ala.1993), and Edwards v. Jesse Stutts, Inc., 655 So.2d *375 1012, 1014 (Ala.Civ.App.1995)). Moreover, this court reviews the facts "in the light most favorable to the findings of the trial court." Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262 (Ala.1996). A trial court's legal conclusions, however, are afforded no presumption of correctness, and this court reviews them de novo. Ex parte Cash, 624 So.2d 576 (Ala.1993); see also § 25-5-81(e)(1), Ala.Code 1975.
We find the resolution of the following issue to be dispositive of Meinhardt's appeal. Meinhardt asserts that § 25-5-57(a)(4) provides for the compensation of employees who suffer from "permanent total disability" and that, because one cannot be deemed permanently and totally disabled without first reaching MMI, the trial court's determination that she had reached MMI on May 1, 2004, precludes the application of § 25-5-57(a)(4)d., Ala. Code 1975. We agree.
Section 25-5-57(a)(4)d. defines "permanent total disability" and provides that "[a]ny employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled." In Clear Creek Transportation, Inc. v. Peebles, 911 So.2d 1059 (Ala.Civ.App.2004), this court held that the penalty provision found in § 25-5-57(a)(4)d. applies to "employees who, after having reached MMI, . . . are incapable of engaging in gainful employment before undergoing any physical or vocational rehabilitation but who would have some degree of capacity to engage in gainful employment if they were to undergo physical or vocational rehabilitation." 911 So.2d at 1064 (emphasis added). In so holding, this court explained:
"The last sentence of paragraph d. of § 25-5-57(a)(4) clearly applies only to those employees who are totally disabled. First, as noted, it is in that section of the statute entitled by the Legislature "Permanent Total Disability." More significantly, the language used by the Legislature makes it clear that this sentence applies to totally disabled employees. Finally, the sanction imposed by this provision for an employee's refusal to undergo rehabilitation is the disqualification of the employee from receiving total-disability benefits. If the employee were not totally disabled in the first instance (that is, in the absence of rehabilitation) the only sanction levied by the statute would be no sanction at all."
Peebles, 911 So.2d at 1064-65.
In its judgment, the trial court concluded, as a matter of law, that Meinhardt was permanently and totally disabled. However, relying on § 25-5-57(a)(4)d., it declined to award permanent and total disability benefits because Meinhardt had failed to "mitigate her damages." The trial court found that Meinhardt had refused psychological treatment as of November 2002 and that Meinhardt had refused to attend any further psychiatric appointments with Dr. Hammond after March 2003. The trial court further found that Meinhardt had resumed psychiatric treatment with Dr. Wilkerson in February 2004. However, the trial court found that Meinhardt had remained noncompliant with prescribed psychological treatment and that, according to Dr. Wilkerson, Meinhardt had not begun psychological therapy as of the date of trial.
SAAD'S contends that Meinhardt's alleged noncompliance with prescribed psychological treatment at the time of trial reveals that Meinhardt continued to refuse treatment, not only before she reached *376 MMI, but also after she reached MMI. Although we recognize that a trial court's findings on disputed evidence in a workers' compensation case are conclusive, and although we are not allowed to reweigh the evidence before the trial court, this court is authorized to determine whether the trial court's decision is supported by sufficient evidence. Ex parte Golden Poultry Co., 772 So.2d at 1176-77. The findings of the trial court will be reversed if they are not supported by substantial evidence. See § 25-5-81(e)(2), Ala.Code 1975 ("In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.").
After reviewing the record, including Dr. Wilkerson's deposition testimony, we conclude that the record does not contain substantial evidence supporting the trial court's finding that Meinhardt continued to refuse treatment after she reached MMI. In his deposition testimony, Dr. Wilkerson testified that he "thought [Meinhardt] needed to return to therapy." However, Dr. Wilkerson testified that he did not refer Meinhardt to a psychotherapist. Furthermore, during a June 10, 2004, appointment with Meinhardt, Dr. Wilkerson noted that, at that time, Meinhardt was seeing a psychologist. It is undisputed that Meinhardt attended all of her scheduled monthly appointments with Dr. Wilkerson after February 2004. Given the evidence presented at trial, we cannot agree with SAAD'S contention that Meinhardt failed to comply with prescribed psychological treatment after she reached MMI.
The trial court determined from the evidence that Meinhardt had reached MMI for her mental condition on May 1, 2004, and it found that Meinhardt had refused treatment during a period of time before she had reached MMI, i.e., before she was entitled to any permanent benefits. This court recognized in Peebles that the penalty provision found in § 25-5-57(a)(4)d. applies to employees who have reached MMI and are thereafter deemed totally disabled. Therefore, we must reverse the judgment of the trial court insofar as it declined to award Meinhardt permanent and total disability benefits and remand this cause for the trial court to reconsider its judgment in a manner consistent with this opinion.[4]
Before addressing the issues raised in the cross-appeal, we note that § 25-5-77(d), Ala.Code 1975, allows for the suspension of payment of temporary-total-disability benefits to an employee if the employee refuses to accept medical treatment offered by the employer, thus providing a penalty for those who refuse treatment before reaching MMI. Section 25-5-77(b) provides as follows:
"If the injured employee refuses to comply with reasonable request for examination, or refuses to accept the medical service or physical rehabilitation, which the employer elects to furnish under this chapter, the employee's right to compensation shall be suspended and no compensation shall be payable for the period of the refusal."
*377 Alabama law provides that benefits will not be suspended if the refusal to undergo proposed medical or surgical treatment is reasonable. Health Care Auth. of Huntsville v. Henry, 600 So.2d 324, 327 (Ala.Civ. App.1992); Mike Makemson Logging v. Colburn, 600 So.2d 1049, 1051 (Ala.Civ. App.1992).
In this case, the trial court concluded that Meinhardt had unreasonably refused medical services from November 10, 2002, to May 1, 2004, the date that Meinhardt reached MMI, and, therefore, that she was not entitled to temporary-total-disability benefits during that period of time. In her brief on appeal, Meinhardt maintains that the penalty found in § 25-5-77(b) is the only penalty applicable in the instant case. Meinhardt goes on to state generally in her brief on appeal that her purported refusal to continue psychological treatment was reasonable in light of the facts of this case; however, she fails to address her contention with any specificity or support her contention with any caselaw. Therefore, we will not address this issue on appeal. See McLemore v. Fleming, 604 So.2d 353, 353 (Ala.1992)(holding that this court will not create legal arguments for an appellant); see also Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994) (it is not the function of the appellate courts to "make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument").
SAAD'S contends on cross-appeal that the trial court should have found the date of MMI to be November 4, 2002, the date Dr. Hammond released Meinhardt to return to work. When MMI is reached depends on the circumstances of the particular case. Hillery v. MacMillan Bloedel, Inc., 717 So.2d 824 (Ala.Civ.App. 1998); Pemco Aeroplex, Inc. v. Johnson, 634 So.2d 1018, 1020 (Ala.Civ.App.1994). "The date of MMI indicates the date on which the claimant has reached such a plateau that there is no further medical care or treatment that could be reasonably anticipated to lessen the claimant's disability." G.UB.MK. Constructors v. Traffanstedt, 726 So.2d 704, 709 (Ala.Civ.App. 1998). "`[MMI] does not mean complete cure or total recovery from the work-related injury.'" Ex parte Phenix Rental Ctr., 873 So.2d 226, 229 (Ala.2003)(quoting 1 Terry A. Moore, Alabama's Workers' Compensation § 13:5 (1998)).
In this case, Dr. Hammond testified that Meinhardt would continue to benefit from further treatment even after she informed Meinhardt that she could return to work in November 2002. SAAD'S concedes on appeal that Dr. Hammond's testimony reveals that Meinhardt had not reached MMI as of November 2002. Dr. Wilkerson placed Meinhardt at MMI between April 8, 2004, and May 6, 2004. According to Dr. Wilkerson, Meinhardt had reached a plateau in her recovery and any further treatment she received would have only a minimal effect on her mental condition. In its judgment, the trial court found that Meinhardt had reached MMI on May 1, 2004. There is substantial evidence to support that finding. Therefore, we affirm the judgment of the trial court as to this issue.
SAAD'S also contends that the trial court erred by calculating Meinhardt's average weekly wage. In its judgment, the trial court determined Meinhardt's average weekly wage to be $485; however, SAAD'S maintains that Meinhardt's average weekly wage was $417.76. SAAD'S arrives at the $417.76 figure by averaging Meinhardt's salary of $14,621.50 over the 35-week period she worked before her March 7, 2002, injury.
*378 Section 25-5-57(b), Ala.Code 1975, a part of the Act, provides a method for computing an employee's average weekly wage when the employee is injured in the first year of his or her employment. That section provides:
"Where the employment prior to the injury extended over a period of less than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed, provided results just and fair to both parties will thereby be obtained. Where by reason of the shortness of the time during which the employee has been in the employment of his or her employer or the casual nature or terms of the employment it is impracticable to compute the average weekly earnings as above defined, regard shall be had to the average weekly amount which during the 52 weeks prior to the injury was being earned by a person in the same grade, employed at the same work by the same employer, and if there is no person so employed, by a person in the same grade employed in the same class of employment in the same district."
This court has held that "`where the formulas for determining average weekly earnings set out [in the statute] are impracticable to apply in a particular case so as to arrive at a just and fair result to both parties, much must be left to the sound judgment and judicial discretion of the trial court.'" Shields v. GTI Corp., 607 So.2d 253, 255 (Ala.Civ.App.1992) (quoting Stevison v. Qualified Pers., Inc., 571 So.2d 1178, 1180 (Ala.Civ.App.1990)). The burden is on the employee to present evidence from which the court can compute his or her average weekly wage. W.W. Dyar & Sons, Inc. v. Cochran, 693 So.2d 527, 529 (Ala.Civ.App.1997).
The calculation method in the first sentence of § 25-5-57(b), dividing the earnings by the number of weeks of employment, is appropriate given the length of Meinhardt's employment. Although § 25-5-57(b) goes on to address circumstances in which the "shortness of time" during which the employee has been employed or "the casual nature or terms of the employment" makes it "impracticable" to compute the average weekly earnings, the circumstances of this case do not support a deviation from the calculation method set forth in the first sentence of § 25-5-57(b). Meinhardt's 35-week period of employment was not so short, nor so casual in nature, as to make it "impracticable" to compute her average weekly earnings in accordance with the first sentence of § 25-5-57(b). The record reveals that Meinhardt chose to work fewer hours on average than other employees during the 35-week period. It is both "just and fair" to calculate Meinhardt's average weekly wage based on the amount of time she worked. Therefore, we reverse the judgment of the trial court on this issue.
Finally, SAAD'S questions whether psychiatric care is covered under the Act. In its brief on appeal, however, SAAD'S answers this question in the affirmative and concedes that psychiatric care is a medical benefit under the Act. SAAD'S maintains that psychiatrists should be deemed medicalcare providers under the Act and, thus, that treatment by a psychiatrist after an employee suffers a compensable injury should be paid for by employers. Because SAAD'S concedes this issue on appeal, we will not address the issue further.
APPLICATION OVERRULED; OPINION OF NOVEMBER 18, 2005, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
*379 CRAWLEY, P.J., and PITTMAN and BRYAN, JJ., concur.
MURDOCK, J., concurs in the result, with writing.
THOMPSON, J., concurs in part and dissents in part, with writing.
MURDOCK, Judge, concurring in the result.
I concur in the result reached by the main opinion.
SAAD'S makes the following argument in its brief to this court:
"The concern that an employee `may not attempt to keep himself or herself in a position to continue receiving total-disability benefits by simply refusing to undergo rehabilitation' was correctly identified by this Court in [Clear Creek Transportation, Inc. v. Peebles, 911 So.2d 1059 (Ala.Civ.App.2004)]. That reasoning, however, would support a decision that there is no reason to differentiate pre-MMI refusals of physical rehabilitation from post-MMI refusals  especially when the statute contains no such distinction."[5]
SAAD'S is correct that the statute contains "no such distinction." The statute simply provides that "[a]ny employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept a reasonable accommodation shall not be deemed permanently and totally disabled." § 25-5-57(a)(4)d.
This court's opinion in Clear Creek Transportation, Inc. v. Peebles, 911 So.2d 1059 (Ala.Civ.App.2004), which I authored, did not add to or take anything from the above-quoted statute. In the course of analyzing the issue of what constitutes "rehabilitation," we did note that the statute applies to "employees who, after having reached MMI, . . . are incapable of engaging in gainful employment . . . but who would have some degree of capacity to engage in gainful employment if they were to undergo physical or vocational rehabilitation." 911 So.2d at 1064 (emphasis added). This statement, however, was intended merely to restate the statute. The point being made was simply that § 25-5-57(a)(4)d. applies only to employees who are, and will continue permanently to be, totally disabled. (The phrase "after having reached MMI" was intended to provide the temporal context for the employee's condition, not for the employee's refusal to undergo rehabilitation.) A more precise and artful way of saying the same thing might have been a reference to "employees who [permanently] are incapable of engaging in gainful employment . . . but who would [not be in that condition but for a refusal to undergo physical or vocational rehabilitation.]"
That said, I nonetheless must concur in the result reached in this case. Although it is a close question that may merit further appellate review, I am not persuaded that the interruption of psychological counseling and psychiatric treatment in this case constituted a "refus[al] to undergo physical or vocational rehabilitation" within the meaning of § 25-5-57.[6]
*380 THOMPSON, Judge, concurring in part and dissenting in part.
I must dissent from the majority opinion insofar as it reverses the trial court's calculation of Meinhardt's average weekly wage. Given the length of Meinhardt's employment, the casual nature of her employment, and the casual terms of her employment, the trial court was within its discretion to compute Meinhardt's average weekly wage based on the average weekly wage of similarly situated SAAD'S employees.
NOTES
[1] The record indicates, and the trial court noted in its final judgment, that SAAD'S conceded
[2] Meinhardt is a licensed practical nurse; she received her nursing degree in 1990 from Southwest State Technical College.
[3] The parties specifically excluded Meinhardt's mental condition from the stipulation regarding MMI made before trial.
[4] Meinhardt also argues on appeal that the penalty provision found in § 25-5-57(a)(4)d. for the refusal to undergo physical and vocational rehabilitation does not include a penalty for the refusal to undergo psychological or psychiatric treatment. By concluding that the trial court incorrectly determined that the penalty provision of § 25-5-57(a)(4)d. applied to Meinhardt based on her refusal to undergo treatment before she had reached MMI, we need not address the issue whether the trial court impermissibly expanded the penalty provision in § 25-5-57(a)(4)d. to include a refusal to undergo psychological and psychiatric treatment.
[5] Indeed, SAAD'S argues, rehabilitation, by definition, occurs before maximum medical improvement is reached.
[6] By way of a comparison, unlike the reference to "physical or vocational" rehabilitation in the quoted passage from § 25-5-57, § 25-5-77(b), Ala.Code 1975, provides a penalty (the suspension of compensation benefits) during the period of an employee's "refus[al] to accept the medical service or physical rehabilitation, which the employer elects to furnish under this chapter." (Emphasis added.) Section 25-5-1(14), Ala.Code 1975, defines "medical" as "[a]ll services, treatment, or equipment provided by a provider." (Emphasis added.) Section 25-5-1(13), Ala.Code 1975, defines "providers" as including psychologists and other persons or entities providing "treatment, service, or equipment."