COBB, Chief Justice.
On January 9, 2008, this Court granted the petition for a writ of certiorari filed by Saad’s Healthcare Services, Inc., to review the Court of Civil Appeals’ opinion, Saad’s Healthcare Services, Inc. v. Meinhardt, 19 So.3d 847 (Ala.Civ.App.2007) (“Meinhardt II”). We affirm.
This case presents significant questions of first impression regarding the proper construction of the definition of “permanent total disability” contained in the Alabama Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975. The statutory definition of “permanent total disability” contains the following exclusion (“the exclusion”):
“Any employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation ... shall not be deemed permanently and totally disabled.”
§ 25-5-57(a)(4)d., Ala.Code 1975.[1]
First, this case presents as an issue of first impression whether, and under what circumstances, the term “physical or vocational rehabilitation” in the exclusion encompasses psychological and psychiatric treatment. Second, this case also presents as an issue of first impression whether the exclusion applies only when the employee refuses physical or vocational treatment after reaching maximum medical improvement (“MMI”). The fact that this Court previously quashed a petition for a writ of certiorari in this case on the second issue of first impression presents the additional procedural question whether the Court may review the second issue at the current stage of the proceedings. We ultimately *865 decide that that issue is not properly before us.

Facts and Procedural History

Cynthia Meinhardt, a licensed practical nurse, brought a worker’s compensation action against Saad’s Healthcare, her employer, seeking benefits for both physical and psychological injuries she sustained on March 7, 2002, as a result of being stabbed 47 times by a patient’s relative while Mein-hardt was engaged in her employment with Saad’s Healthcare. Among Mein-hardt’s physical injuries were cuts to her jugular vein and a collapsed right lung. In addition to the physical injuries from the knife wounds, following the attack Mein-hardt suffered from depression and post-traumatic stress disorder (“PTSD”).
Meinhardt underwent two months of physical therapy to improve the use of her hands, her right shoulder, and her right arm. Insofar as her physical injuries were concerned, Meinhardt was ultimately released to work at full duty with no work restrictions, no permanent impairment, and no disability. The parties have stipulated that Meinhardt reached MMI with regard to the injury to her right shoulder on June 25, 2002, and as to the remainder of her physical injuries on September 13, 2002. However, Meinhardt continued to suffer from PTSD and depression even after she was cleared to return to work •with regard to her physical injuries. As a result of her psychological state, Mein-hardt was unable to perform her work as she had before she was attacked.
On July 30, 2004, the trial court held a hearing on Meinhardt’s worker’s compensation claims at which it heard ore tenus evidence. After the hearing, the trial court found that Meinhardt was permanently and totally disabled because of her psychological injuries and that she had reached MMI with regard to those injuries on May 1, 2004. However, the trial court also found that, before the date on which she had reached MMI as to the psychological injuries, Meinhardt had unreasonably refused to accept medical treatment in the form of psychological and psychiatric care. Based upon its interpretation of § 25-5-57(a)(4)d., Ala.Code 1975, a part of the Workers’ Compensation Act, the trial court held that the exclusion in § 25-5-57(a)(4)d. precluded Meinhardt from being classified as permanently and totally disabled. The trial court concluded that Me-inhardt had sustained a 90% physical impairment of her body as a whole and that, as a result of her injuries, she had a 90% vocational disability, and the trial court awarded benefits accordingly. Meinhardt appealed, and Saad’s Healthcare cross-appealed.
In Meinhardt v. Saad’s Healthcare Services, Inc., 952 So.2d 368 (Ala.Civ.App.2006) (“Meinhardt I”), the Court of Civil Appeals reversed the trial court’s judgment, which was based on the holding that, under the exclusion found in § 25-5-57(a)(4)d., Ala.Code 1975, Meinhardt’s refusal to accept treatment before reaching MMI warranted a finding that she was entitled to less than full payment of permanent total-disability benefits. The Court of Civil Appeals held that the exclusion in § 25-5-57(a)(4)d. did not apply to Meinhardt’s refusal of treatment because, the Court of Civil Appeals stated, § 25-5-57(a)(4)d. applies only to “ ‘employees who, after having reached MMI, ... are incapable of engaging in gainful employment before undergoing any physical or vocational rehabilitation but who would have some degree of capacity to engage in gainful employment if they were to undergo physical or vocational rehabilitation.’ ” 952 So.2d at 375 (quoting Clear Creek Transp., Inc. v. Peebles, 911 So.2d 1059, 1064 (Ala.Civ.App.2004)).
*866 Saad’s Healthcare sought certiorari review of the Court of Civil Appeals’ opinion in Meinhardt I. On May 9, 2006, this Court granted Saad’s Healthcare’s petition to review the following question: whether the Court of Civil Appeals correctly construed the penalty provision in § 25-5-57(a)(4)d. to apply only to an employee who refuses rehabilitation after, and not before, reaching MMI. On September 15, 2006, upon examination of the petition and the parties’ submissions, this Court quashed the writ without an opinion.
While the case was pending on appeal, Meinhardt again refused psychological and psychiatric treatment. When the case returned to the trial court on remand, Saad’s Healthcare took the position that Mein-hardt was ineligible to be considered permanently and totally disabled because she refused psychological and psychiatric treatment after reaching MMI.
The Court of Civil Appeals, in Mein-hardt II, described the subsequent proceedings before the trial court as follows:
“After [the Court of Civil Appeals] released its opinion in Meinhardt I, the trial court set the case for review. Before the trial court reviewed the case on remand, Saad’s Healthcare filed a motion on October 10, 2006, to set an evi-dentiary hearing or, in the alternative, for a ruling that Meinhardt was non-compliant with physical or vocational rehabilitation due to her alleged refusal of psychological and psychiatric treatment since March 24, 2005. On October 23, 2006, the trial court conducted a hearing to review the case on remand, and on October 31, 2006, it entered an amended order stating, in pertinent part, as follows:
“ ‘[T]he Court hereby VACATES and AMENDS its “Findings of Fact, Conclusions of Law, and Final-Judgment” entered on August [23], 2004, as follows:
“ ‘a. The Court finds that although Cynthia Meinhardt was non-compliant with her prescribed psychological and/or psychiatric treatment between March 2003 and May 1, 2004, Cynthia Meinhardt was compliant with her prescribed treatment thereafter.
“ ‘b. The Court finds that, as a proximate result of the March 7, 2002, assault, Cynthia Meinhardt is Permanently and Totally Disabled from gainful employment within the meaning of § 25-5-57(a)(4) of [the Workers’ Compensation Act]. After giving due consideration to her age, education, work skills, physical disabilities and psychological disabilities, Cynthia Meinhardt cannot be successfully retrained for any substantial gainful employment.
“ ‘c. The Court finds that [Mein-hardt’s] average weekly wage at the time of the injury was $417.76. The weekly benefit rate for disability benefits is $278.51.’
“(Emphasis in original.) ....
“On November 15, 2006, Saad’s [Healthcare] filed a motion to alter, amend, or vacate the trial court’s October 31, 2006, amended order and/or a petition to alter, amend, or revise the amended order. In its motion, Saad’s [Healthcare] argued that Meinhardt had stopped taking her antidepressant medication after March 24, 2005, and that Meinhardt was noncompliant with her treatment after having reached MMI. Based on what it alleged was Mein-hardt’s failure to comply with treatment after March 24, 2005, Saad’s [Healthcare] maintained that the penalty provision found in § 25-5-57(a)(4)d. applied to prevent Meinhardt from being found permanently and totally disabled.
*867 “On November 17, 2006, the trial court conducted an evidentiary hearing on Saad’s [Healthcare’s] November 15, 2006, motion. At that hearing, Saad’s [Healthcare] introduced the November 8, 2006, deposition testimony of Dr. [William] Wilkerson, Meinhardt’s psychiatrist; a July 29, 2004, deposition of Dr. Wilkerson; and copies of Meinhardt’s medical records maintained by Dr. Wilkerson. The trial court did not receive ore tenus evidence at the November 17, 2006, hearing.
“On December 7, 2006, the trial court entered an order denying the November 15, 2006, motion to alter, amend, or vacate and petition to alter, amend, or revise the amended order. In its order denying the motion, the trial court determined, as a matter of law, that the penalty provision found in § 25-5-57(a)(4)d. did not apply to Meinhardt because the psychiatric treatment Mein-hardt allegedly refused did not constitute ‘physical or vocational rehabilitation’ under that statute. The trial court also concluded that Saad’s [Healthcare] did not demonstrate that Meinhardt’s alleged failure to comply with her psychiatric treatment was unreasonable and, therefore, that it warranted the suspension of her compensation benefits under § 25-5-77(b), Ala.Code 1975. The trial court also declined to alter, amend, or revise its award of permanent and total disability benefits pursuant to § 25-5-57(a)(4)b., based on evidence indicating that Meinhardt was unable to work because of her mental condition.”
Meinhardt II, 19 So.3d at 851-52 (footnote omitted).
Saad’s Healthcare then appealed the case for a second time to the Court of Civil Appeals. Saad’s Healthcare contended that the trial court erred by finding in favor of Meinhardt because, according to Saad’s Healthcare, the undisputed evidence proved that Meinhardt had unreasonably refused physical or vocational rehabilitation in the form of psychological and psychiatric treatment after reaching MMI. Therefore, Saad’s Healthcare argued, the exclusion found in § 25-5-57(a)(4)d., AIa.Code 1975, precluded an award of permanent total-disability benefits. The Court of Civil Appeals rejected Saad’s Healthcare’s contention. That court held that the exclusion in § 25-5-57(a)(4)d., which precludes a finding of permanent total disability when an employee refuses to undergo “physical or vocational rehabilitation,” does not apply to refusals of psychological or psychiatric treatment. Saad’s Healthcare again sought certiorari review, and this Court granted the writ on January 9, 2008.

Evidence Regarding the Nature of the Psychological and Psychiatric Treatment Meinhardt Refused

Saad’s Healthcare argues that the evidence presented to the trial court demonstrates that the psychological and psychiatric treatment Meinhardt refused was intended to treat her physical disability and that its goal was the restoration of physical and vocational function. In support of this argument, Saad’s Healthcare cites an April 30, 2002, note by Dr. Jake Epker, one of Meinhardt’s treating psychologists, in which Dr. Epker wrote:
“I spent time educating the patient and her husband regarding the fact that she is experiencing a normal reaction to traumatic events and that many of the physical symptoms she describes are likely due to anxiety, but that her symptoms will improve through a combination of medication and therapy.”
Saad’s Healthcare also references the following testimony from the July 29, 2004, *868 deposition of Dr. William Wilkerson, a psychiatrist who treated Meinhardt:
“Q: ... Is there a psychological component to how they [a hypothetical person with no depression and a hypothetical person with moderate depression] view pain, I guess is what I am getting at?
“A: Well, that’s a different question, and the answer is yes, there is a psychological component to pain.
“Q: Elaborate on that, if you don’t mind, because I failed to ask you the right question that gets to that issue.
“A: Well, I think I understand what— the subject matter, at any rate. I am not sure I understand the specific question even now, but the relationship between physical symptoms and depression is complex, and varies from patient to patient, and varies with the type of ailment a person has. It is true that some people, when they are depressed, will suffer more with particularly pain, than someone who is not depressed. However, it’s well known people get depressed and then they will become physically ill. Likewise, they become physically ill and then they get depressed.
“The brain is part of the body. The brain is, in fact, the sensing mechanism for pain. If the brain is sick, then it stands to reason that there is going to be a difference in the perception of any physical symptom. But it may go the other way. It may be that the person is less aware of their physical symptoms. They may neglect themselves and become sicker because they are just not perceiving, for example, that they are becoming dehydrated.
“So, I mean, as I say, the relationship is complex. It’s not something you can just cut it out and say that is it.”
The following passage from the November 8, 2006, deposition of Dr. Wilkerson addresses the nature of psychological and psychiatric treatment:
“Q: Is posttraumatic stress disorder and major depression something that could also affect your physical condition; how you feel; how you function physically?
“A: Particularly major depression. People need to have their depression treated in order to heal at the best rate because the body’s immune response is altered when somebody is depressed. Their motivation to do things can be impaired by depression.
“Q: Well, then in this case with the major depression and the posttrau-matic stress disorder, would the psychiatric/psychological treatment that had been prescribed be intended to help both her mental condition and her physical well-being?
“A: The treatment is not directed at her physical problems. It would be more directed at her emotional response to what happened to her; her response to the injuries and to her pain; and trying to help her be the best she can be; to try to decrease the troublesome painful symptoms as much as possible.
“Q: And I think last time you had testified that her condition, as of your last deposition, you felt that she was unable to work?
“A: That’s correct.
“Q: Would psychiatric and psychological treatment which is to — as you just indicated — improve her overall functioning, that that’s something that would also, if successful, be intended to return her to work if possible or get her to a position where she could *869 actually engage in some kind of gainful employment down the road?
[[Image here]]
“A: You really don’t have any limit on what you’re trying to achieve with any kind of treatment. You’re trying to make the person the best they can be whether it’s orthopaedic surgery or psychiatry or anything else. We need to as psychiatrists be somewhat disciplined as Freud said and direct ourselves to the diseased part of the person.
“Q: Let me ask it differently. The diseased part here being the mind affects both her physical condition and her ability to work; is that accurate?
“A: Yes.
“Q: And that if you’re able to improve the mind you would therefore improve her physical condition and hopefully potentially possibly her ability to work?
“A: It would depend on the case. In terms of improving her physical condition obviously, if her lungs are so damaged that they’re not going to get better beyond a certain point, psychiatric treatment is not going to make her lungs any better. If she develops, for example, arthritis because of injuries she’s had at the various joints, she may — psychiatric treatment may make her better able to tolerate her pain and suffering and become adjusted to the result of disability, but it’s not going to make her joints get well, if that’s clear enough.
“Q: I think I understand what you’re saying. That you’re not treating with a focus towards improving physical condition or vocational ability; you’re looking to treat the mind because that’s where — that’s your focus; is that more accurate than what I said before?
“A: Yes.
“Q: But wouldn’t a by-product of treating the mind also be potentially improving her physical condition or her ability to work ... as a by-product?
“A: It would depend on the case. Some people clearly are not going to be able to work. Others are. That’s not actually a goal of what we do typically.... Well, this harkens back to the previous deposition where we talked a little bit about military medicine and psychiatry where they put hospitals up near the front and when guys come back with shellshock— which is, you know, a form of post-traumatic stress disorder — they patch them up fast and try to get them back to the unit. There have been some people that said they didn’t know whether that was a good idea or not. Anyway, that’s usually — that’s not really a goal of psychiatry per se, but it may well be a by-product depending on the case.
“Q: And I think that’s the disconnect I was having the way I was asking it as far as the goal. But let me ask you this. In your opinion is it her mind or her mental condition that is preventing her from work?
“A: That’s a big part of it. But as I point out, she had pretty bad physical symptoms too.
“Q: Are you treating the physical symptoms or the physical complaints—
“A: No.
“Q —or you’re treating strictly the mental complaints?
“A: Yes.
“Q: And your opinion that she’s unable to work is based upon her mental condition?
“A: Yes, that’s my area.
*870 “Q: And so if her treatment for her mental condition improved her mental status, would not a by-product also possibly be, not your goal, but a potential by-product be that it would improve her ability to work?
[[Image here]]
“A: It may well be. It would remain to be seen depending on the case.
“Q: And how the patient responded to treatment?
“A: Yes.”
This Court notes that this evidence was not accurately conveyed in Saad’s Healthcare’s briefing on the issues.[2]
Meinhardt, however, argues that the above testimony demonstrates that her refusal of psychological and psychiatric care in this case was not a refusal to undergo physical or vocational rehabilitation because, she argues, the psychological and psychiatric care was not intended to restore her physical and vocational functions. Meinhardt also relies on the following testimony by Dr. Wilkerson:
“Q: Do you consider your treatment of Ms. Meinhardt to be physical rehabilitation?
“A: No, sir.
“Q: Do you consider your treatment with Ms. Meinhardt to be vocational rehabilitation?
“A: No, sir.”

Standard of Review

“An appellate court reviews the burden of proof applied at trial and other legal issues in workers’ compensation claims without a presumption of correctness.” Ex parte USX Corp., 881 So.2d 437, 441 (Ala.2003) (citing § 25-5-81(e)(l), Ala.Code 1975, and Ex parte Drummond Co., 837 So.2d 831, 832 (Ala.2002)). However, “[i]n reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.” § 25 — 5—81(e)(2), Ala. Code 1975; see also Ex parte Trinity Indus., Inc., 680 So.2d 262, 268-69 (Ala.1996) (“[W]e will not reverse the trial court’s finding of fact if that finding is supported by substantial evidence — if that finding is supported by ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989))). “The trial court’s *871 findings of fact ‘ “on disputed evidence in a workers’ compensation case are conclusive.” ’ ” Ex parte Drummond Co., 837 So.2d at 832-33 (quoting Ex parte Golden Poultry, 772 So.2d 1175, 1176 (Ala.2000), quoting in turn Ex parte Ellenburg, 627 So.2d 398, 399 (Ala.1993)).

Analysis

In its petition for certiorari review, Saad’s Healthcare presents two issues regarding the interpretation of the exclusion in § 25-5-57(a)(4)d. First, Saad’s Healthcare argues that the Court of Civil Appeals erred in Meinhardt II by concluding that the exclusion does not apply to the refusal of psychological or psychiatric treatment. Second, Saad’s Healthcare argues that the Court of Civil Appeals erred in Meinhardt I by concluding that the exclusion does not apply when the employee refuses physical or vocational rehabilitation before reaching MMI.
I. Whether, in Meinhardt II, the Court of Civil Appeals erred by concluding that the exclusion does not apply to refusals of psychological or psychiatric treatment.
Saad’s Healthcare argues that all psychological and psychiatric treatment provided a disabled worker under the Workers’ Compensation Act is for the purposes of either physical or vocational rehabilitation (or both). In support of its position, Saad’s Healthcare cites Fruehauf Corp. v. Prater, 360 So.2d 999 (Ala.Civ.App.1978), in which the Court of Civil Appeals held:
“[I]f it is established by legal evidence that an employee has suffered a physical injury or trauma in the line and scope of his employment and he develops a neurosis as a proximate result of such injury or trauma which neurosis causes or contributes to an occupational or physical disability, such disability is compen-sable.”
360 So.2d at 1001.
Saad’s Healthcare argues that, because only mental impairment that “causes or contributes to an occupational or physical disability” is compensable under the Workers’ Compensation Act, see id., all psychological and psychiatric treatment provided under the Act is intended to treat the cause of the worker’s physical and vocational disability. Thus, according to Saad’s Healthcare, all psychological and psychiatric treatment provided under the Act treats the worker’s physical and vocational disabilities and, therefore, Saad’s Healthcare argues, constitutes physical and vocational rehabilitation.
The Workers’ Compensation Act does not define the terms “vocational rehabilitation” or “physical rehabilitation.” Therefore, to determine whether Mein-hardt’s post-MMI refusal of psychological and psychiatric treatment renders her ineligible to be considered permanently and totally disabled by operation of the exclusion, we must first determine the threshold matter of what is meant by the words “physical [and] vocational rehabilitation” as used in the exclusion.
“ ‘ “The fundamental principle of statutory construction is that words in a statute must be given their plain meaning.” Mobile Infirmary Med. Ctr. v. Hodgen, 884 So.2d 801, 814 (Ala.2003). “When a court construes a statute, ‘[w]ords used in [the] statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says.’ ” Ex parte Berryhill, 801 So.2d 7, 10 (Ala.2001) (quoting IMED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)). Addition *872 ally, “ ![c]ourts must liberally construe the workers’ compensation law “to effectuate its beneficent purposes,” although such a construction must be one that the language of the statute “fairly and reasonably” supports.’ ” Ex parte Weaver, 871 So.2d 820, 824 (Ala.2003) (quoting Ex parte Beaver Valley Corp., 477 So.2d 408, 411 (Ala.1985)).’
“Trott v. Brinks, Inc., 972 So.2d 81, 85 (Ala.2007). Similarly, ‘[w]e have often stated that “the meaning of statutory language depends on context,” and that, as a result, statutes must be read as whole in order to ascertain the meaning and intent of each component.’ Ex parte Master Boat Builders, Inc., 779 So.2d 192, 196 (Ala.2000) (quoting Ex parte Jackson, 614 So.2d 405, 406 (Ala.1993)).”
Ex parte Ruggs, 10 So.3d 7, 11-12 (Ala.2008).
Thus, to arrive at definitions of “vocational rehabilitation” and “physical rehabilitation” that will enable us to determine whether either encompasses the psychological and psychiatric treatment Meinhardt refused, we must consider the “natural, plain, ordinary, and commonly understood meaning” of “vocational rehabilitation” and “physical rehabilitation,” respectively, as well as context of those terms within the Workers’ Compensation Act as a whole.
“Vocation” is defined as “[o]ne’s regular calling or business; one’s occupation or profession.” Black’s Law Dictionary 1605 (8th ed.2004). “Rehabilitation” is defined as “restoring] to a former capacity: rein-stat[ing] or bringing] to a condition of health or useful and constructive activity.” Merriam-Webster’s Collegiate Dictionary 1049 (11th ed. 2003) “ ‘Restore’ means to put back. The ability to be gainfully employed must be put back or restored through vocational rehabilitation.” Ex parte Beaver Valley Corp., 477 So.2d 408, 412 (Ala.1985).
Thus, “vocational rehabilitation” is the provision of goods or services for the purpose of restoring a disabled worker’s ability to engage in suitable gainful employment. See Ala.Code 1975, § 25-5-77(c) (“If the employer so elects, the employee shall submit to and undergo vocational rehabilitation at the employer’s expense through a vocational rehabilitation specialist, who shall be qualified to render competent vocational rehabilitation service.” (emphasis added)); see also Ala. Code 1975, § 21-9-2(3)(c) (defining “Adult Vocational Rehabilitation Service” in the context of the Alabama Rehabilitation Act, § 21-9-1 et seq., Ala.Code 1975, as “[a] service program that provides training and employment-related services for persons who have disabilities that present a substantial barrier to employment and who, as a result of services, have a reasonable expectation of becoming employed”); Ex parte Beaver Valley Corp., All So.2d at 412 (stating that the vocational rehabilitation “program should be reasonably calculated to restore the employee to suitable employment providing an income comparable to that earned pri- or to the injury” and that the purpose of § 25-5-77(c), Ala.Code 1975, the statutory provision creating the right of a disabled worker, and the obligation, to undergo vocational rehabilitation, “is to restore the injured employee to suitable gainful employment”); Ala. Admin. Code (Division of Rehabilitative Services) r. 795-6-1-.07 (“Vocational rehabilitation services provided under [the Alabama] Rehabilitation Act are any goods or services necessary to render an eligible individual employable -”); see also, e.g., 29 U.S.C. § 723(a) (defining “vocational rehabilitation services” in the context of the federal rehabilitation act); 2 Terry A. Moore, Alabama Workers’ Compensation § 17:45 *873 (1998 & 2007 Supp.) (“The purpose of vocational rehabilitation is not to improve the injured employee’s station in life, but to restore the employee to suitable employment providing an income comparable to that earned prior to the injury.”).
“Physical” means “[rjelating or pertaining to the body, as distinguished from the mind or soul or the emotions.” Black’s Law Dictionary 1147 (6th ed.1990).[3] Thus, “physical rehabilitation” is the provision of goods or services for the purpose of restoring function to a disabled person’s body, as opposed to the person’s mind or emotions.[4]
Saad’s Healthcare cites no evidence to support the conclusion that the post-MMI psychological and psychiatric treatment Meinhardt refused was a good or service provided for purposes of restoring function to Meinhardt’s body or of restoring her ability to engage in suitable gainful employment. The evidence on this issue is Dr. Wilkerson’s testimony that, although Meinhardt’s post-MMI psychological and psychiatric treatment did not have a “goal” or “focus” of restoring her ability to work, the treatment could “potentially,” “possibly,” or as a “by-product” have that effect, although “[i]t would remain to be seen depending on the case” and how Mein-hardt responded to the treatment. Similarly, Dr. Wilkerson testified that Mein-hardt’s treatment was “not directed at” or “foeus[ed] on” Meinhardt’s physical symptoms and that he was not “treating [Mein-hardt’s] physical symptoms or the physical complaints” but was “treating strictly the mental complaints.” That is, Dr. Wilkerson’s testimony demonstrates that the purpose of the post-MMI psychological and psychiatric treatment Meinhardt refused was not to treat her physical or vocational disability by restoring physical function or the ability to engage in gainful employment. This testimony provides ample basis for the trial court’s judgment. Mein-hardt, moreover, was cleared to return to work with regard to her physical disabilities before reaching MMI with regard to her psychological impairments.
Because the post-MMI treatment Mein-hardt refused was not offered for the purpose of restoring her physical function or her ability to engage in gainful employment, but was instead offered to treat her mental impairments, that treatment was not “physical or vocational rehabilitation” within the meaning of the exclusion found in § 25-5-57(a)(4)d. Therefore, we hold that the Court of Civil Appeals was correct in determining that Meinhardt is not disqualified by the exclusion from being considered permanently and totally disabled based on her refusal of psychological and psychiatric treatment after she reached MMI.
II. Whether, at this stage of the proceedings, it is proper for this Court to review the conclusion of the Court of Civil Appeals in Meinhardt I that the exclusion does not apply when the employee refuses physical or vocational rehabilitation before reaching MMI.
As Meinhardt points out, Saad’s Healthcare previously sought certiorari re *874 view of this issue after the Court of Civil Appeals issued its opinion Meinhardt I, in which the Court of Civil Appeals held that the exclusion does not apply when a disabled employee refuses physical and vocational rehabilitation before the employee reaches MMI. This Court granted the writ with regard to this issue; however, it later quashed the writ without addressing the issue. As in this case, when this Court dismisses a petition for a writ of certiorari challenging a lower court’s original determination as to an issue and that dismissal does not address the merits of the petition as to that issue, we will not permit subsequent petitions for certiorari for the purpose of successive reviews of the original ruling or decision of the lower court on that issue. See Jones v. State, 214 Ala. 242, 107 So. 49 (1926). The decision of the Court of Civil Appeals in Meinhardt II did not expressly or implicitly address the issue whether the exclusion applies to Mein-hardt’s pre-MMI refusal of psychological and psychiatric treatment. Instead, the Court of Civil Appeals in Meinhardt II was solely concerned with the application of the law to the facts of Meinhardt’s post-MMI refusal of treatment. Thus, Mein-hardt II did not reopen the issue whether the exclusion applies to Meinhardt’s pre-MMI refusal of treatment. See Jones, 214 Ala. at 242, 107 So. at 50. At this stage of the proceedings, the application of the exclusion to pre-MMI refusals of physical and vocational rehabilitation is not properly before this Court for review.

Conclusion

For the reasons stated above, we affirm the judgment of the Court of Civil Appeals holding that the exclusion in § 25-5-57(a)(4)d., AIa.Code 1975, does not disqualify Meinhardt from being deemed permanently and totally disabled based on her refusal of psychological and psychiatric treatment after reaching MMI.
AFFIRMED.
SEE, LYONS, WOODALL, STUART, SMITH, and BOLIN, JJ., concur in the result.
PARKER, J., dissents.

. In full, § 25-5-57(a)(4)d. defines “permanent total disability” as follows:
"The total and permanent loss of the sight of both eyes or the loss of both arms at the shoulder or any physical injury or mental impairment resulting from an accident, which injury or impairment permanently and totally incapacitates the employee from working at and being retrained for gainful employment, shall constitute prima facie evidence of permanent total disability but shall not constitute the sole basis on which an award of permanent total disability may be based. Any employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled.”

. In support of its core argument that the evidence demonstrated that "any improvement in [Meinhardt's] mental condition would also lead to a vocational improvement,” Saad’s Healthcare’s brief at 16-17, 40-41 (emphasis added), Saad’s Healthcare effectively misstated the substance of Dr. Wilkerson's November 8, 2006, testimony by omitting(without indicating the omission) material qualifying words and phrases (such as "possibly,” “potentially],” and "but not the goal”) from questions asked of Dr. Wilkerson and from his responses. Specifically, twice in its initial brief Saad's Healthcare represented Dr. Wilkerson’s November 8, 2006, testimony as follows:
" 'Q: The diseased part here being the mind affects both her physical condition and her ability to work.
" 'A: Yes.
[[Image here]]
" 'Q: And your opinion that she’s unable to work is based upon her mental condition?
" 'A: Yes, that's my area.
" 'Q: And so if her treatment for her mental condition improved her mental status, would not a by-product be that it would improve her ability to work?
" 'A: It may well be ....'”
Saad’s Healthcare's brief at 16-17, 40-41 (ellipses placed as in original; other omissions not indicated in original). On application for rehearing, counsel for Saad's Healthcare represented to this Court that the presentation of die testimony in this manner was a proofreading error.

. The definition of "physical” was not carried forward into the 7th or 8th edition of Black's.

. Judge Moore’s conclusion that "the phrase 'physical or vocational rehabilitation,' as used in § 25-5-57(a)(4)d., should be construed as any treatment, plan, or program that would decrease the physical disability resulting from an injury or reduce the loss of earning capacity caused by the injury,” Meinhardt II, 19 So.3d at 859 (Moore, J., concurring in part and dissenting in part), materially changes the language of the statute. Under Judge Moore's view, the exclusion would apply to anyone “who shall have refused to undergo any treatment, plan, or program that -would decrease the physical disability ...."