This case addresses the meaning of the term "rehabilitation" in § 25-5-57(a)(4)d, Ala. Code 1975, which states that "[a]ny employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled." The trial court rejected the employers' argument that "rehabilitation," for purposes of that statute, may consist solely of a former employer locating one or more jobs that the former employer contends the employee is capable of performing. We too reject that argument, and, accordingly, we are compelled to affirm the trial court.
In February 2001, Harold Peebles ("the employee") filed an action against Clear Creek Transportation, Inc., and Skilstaf, Inc. ("the employers"),[2] seeking benefits under the Workers' Compensation Act, § 25-5-1 et seq., Ala. Code 1975, based upon an alleged work-related injury that had purportedly occurred in May 1999. After an ore tenus proceeding, the trial court entered a judgment in which it found that the employee had suffered a permanent and total disability. As part of its judgment, the trial court also made a finding that the employee had not refused "suitable employment" because he "ha[d] not been offered a job by any employer since" the date of his injury. Further, the trial court held that the employers had not offered vocational rehabilitation "in the manner as defined by the . . . [Workers' Compensation] Act." We note further that the trial court found the employee to be "incapable of gainful employment and of earning a living" even if such vocational rehabilitation were to be offered. The employers appealed to this court.
"[T]he supreme court has consistently determined that the applicable standard of review does not allow this court to reweigh the evidence presented to the trial court." MayfieldTrucking Co. v. Napier, 724 So.2d 22, 25 (Ala.Civ.App. 1998) (citing Ex parte Alabama Ins. Guar. Ass'n, 667 So.2d 97 (Ala. 1995)).
The employers primarily argue on appeal that the employee's actions in this case were tantamount to a refusal of "suitable employment" and that this refusal was in turn tantamount to a refusal of "vocational rehabilitation" within the contemplation of § 25-5-57(a)(4)d.[3]
On May 24, 1999, the employee, who was 58 years old at the time, suffered an injury arising out of and in the course of his employment as a delivery-truck driver. Specifically, the employee slipped while inside a trailer, falling and injuring his neck, his right shoulder, and his rib cage. On the following day, he was diagnosed with a separation of the acromioclavicular joint and was prescribed analgesic medicine. In November 1999, after the employee had experienced severe pain in his neck, arms, and legs, Dr. Joel D. Pickett successfully *Page 1061 
operated on the employee to repair a cervical-disk herniation and to remove bone spurs apparently caused by the fall. Thereafter, the employee underwent physical therapy, as well as a functional-capacities evaluation ("FCE"). During the FCE, the employee reported experiencing severe pain, although he later reported not having problems completing the FCE. Moreover, the employee was described by the evaluating therapist as not having expended consistent effort during the FCE. In mid-April 2000, Dr. Eric Beck, the employee's treating physician, assigned the employee a 15% physical-impairment rating and concluded that the employee had reached maximum medical improvement ("MMI").
Although the employee was released to return to work in April 2000, he did not return to work for the employers because, he said, he had been terminated from their employment. The employee also did not seek or accept any other work. The employee consulted Dr. Cyrus Ghavam, an orthopedic surgeon, in June 2000; Dr. Ghavan diagnosed the employee as suffering from cervical stenosis. Dr. Ghavam recommended further surgery. The employee was subsequently found to be disabled by the federal Social Security Administration. Thereafter, in October 2000, the employee underwent a second surgery performed by Dr. Pickett, a cervical microlanotomy. After the second surgery, Dr. Pickett noted that the employee would reach MMI on January 13, 2001, that the employee could resume his normal activities as of that date, and that the employee had suffered a permanent physical impairment of 11%.
Despite the foregoing, the employee continued to complain of chronic neck pain and parasthesias (i.e., episodes of tingling) in his extremities. Dr. Pickett referred the employee back to Dr. Beck for reevaluation; based upon electrodiagnostic testing, Dr. Beck found no evidence of a pinched nerve and again assigned the employee a 15% permanent physical-impairment rating. However, the employee continued to complain of neck pain and limitations in his ability to move his neck laterally or upward.
After litigation had arisen between the employee and the employers, Dr. Beck requested that the employee undergo a second FCE in June 2002. In his report of that FCE, Dr. Beck indicated that the employee's "Spurling's test" was negative bilaterally, which indicated no ongoing neural compression. The employee declined to complete a "modified step test" because he reported having heard a popping sound in his neck. Dr. Beck, however, reported that the employee exhibited equivocal effort. Based upon the second FCE, Dr. Beck opined that the employee should have no restrictions on sitting, standing, walking, squatting, or balancing; however, Dr. Beck limited the employee to occasionally lifting up to 15 pounds and frequently lifting up to 10 pounds, somewhat lighter lifting limitations than Dr. Beck considered to be within the employee's capacities in April 2001.
In the spring of 2002, Skilstaf's workers' compensation insurance carrier retained the services of Re-Employment Services, Ltd. ("RES"). RES claims to specialize "in matching [an] injured worker's physical capabilities to job opportunities." RES conducted a labor-market survey in the geographic area located within a 30-mile radius of the employee's home in an effort to locate specific, unfilled jobs that the employee would be purportedly capable of performing in his injured state. The founder of RES, Gordon R. Butler, testified that each potential opening located for a given injured employee required between 90 and 100 telephone calls by RES personnel to prospective employers. *Page 1062 
As a result of the above-described efforts by RES personnel, a number of open positions were located that, according to Butler, the prospective employers had indicated the employee would be capable of performing the work involved. Those reported openings involved work as an insurance salesman, a telephone operator, an automobile salesman, a telephone solicitor, a financial-institution manager, an account-collection clerk, and a machine operator.
After conducting its initial survey, RES provided to Dr. Beck forms, requesting that he complete the forms and indicate his opinion as to whether the employee could perform the tasks required in each of the positions it had located. After the second FCE had been conducted, Dr. Beck completed the forms provided to him by RES; in completing those forms, he indicated that each of the positions was appropriate for the employee, so long as the employee did not have to lift more than 15 pounds. Dr. Beck later indicated that five out of six other positions located by RES (including positions as a recreation-facility attendant, a security guard (two positions), a retail-sales representative, and a customer-service representative) were, in his opinion, within the employee's capabilities.
On July 9, 2002, after RES had conducted both its initial and supplemental job-market surveys, RES for the first time sent a letter via facsimile to the attorney representing the employee requesting permission to interview the employee to determine "not only his wants and desires but his educational level, work experience, military service," and other employment-related factors. Counsel for the employee denied RES permission to contact the employee; the employee testified that he did not personally receive notice of RES's job-search efforts.
Thereafter, notwithstanding the response by counsel for the employee to RES's initial request for information, RES began scheduling job interviews for the employee. Between July 12 and July 31, 2002, RES sent six notices to counsel for the employee notifying him that it had arranged these job interviews. The employee did not complete employment applications or attend any of the job interviews reportedly scheduled for him by RES.
Both the employers and the employee retained vocational experts who testified at trial. The employers' vocational expert, Eddie Rice, testified that he had interviewed and evaluated the employee and had concluded that the employee suffered a vocational disability of 62% as a result of his injury. Rice also opined that the employee could perform the work required by each of the positions located by RES. The employee's vocational expert, Patsy Bramlett, also interviewed and evaluated the employee. She concluded, however, that the employee had suffered a 100% vocational disability.
In addition to the evidence provided by the vocational experts, the employee testified that he is a high-school graduate, that he has not attended vocational school or college, and that his "primary vocational history" for the last 30 years was that of a truck driver. The employee also testified at trial that he did not think he was able to drive a truck:
 "Q. [By employee's counsel]. Do you think you are able to drive a truck at this time?
"A. No, sir.
"Q. Why is that?
 "A. . . . I can't ride for very long periods of time, plus when you go into a dock to deliver you have to back in and I'm not able to turn sideways in a truck to get out to safely park a truck.
"Q. Why is that? *Page 1063 
 "A. Takes too much movement turning around in the seat being able to reach the clutch and brake.
"Q. Does it involve rotation of your neck?
"A. Yes, sir.
". . . .
 "Q. What other reasons do you believe that you are not able to drive a truck if there is another reason?
 "A. I can't sit for long periods of time and drive because I go to getting headaches and my eyes I get to where I can't really focus on the road. . . ."
The employee also testified that he did not know of any type of gainful work he could perform.
At trial, the employee testified that he constantly experiences pain and that the pain has increased since his second surgery. He also testified that takes pain medication every four to six hours and that his dosage of pain medication has continued to increase since his surgeries. The employee also testified that "physically and mentally [he] get[s] real short with people," that he is not able to sit for long periods, that he has no appetite because of the pain medication he takes, and that he is not able to get out and do the things he enjoys doing. He further stated that when he sleeps his arms go to sleep and his neck still "bother[s][him] real bad and [he has] to get up" and walk around. The employee further testified that he was experiencing pain during the trial and that his pain was "constant."
"[I]t is well established that the trial court is in the best position to observe the demeanor and credibility of the employee and other witnesses in a workers' compensation case." MayfieldTrucking Co., 724 So.2d at 25. "The resolution of conflicting evidence is within the exclusive province of the trial court, and this court is forbidden to invade that province upon review."Id. "Further, it is well established that the trial court is in the best position to observe the demeanor and credibility of the employee and other witnesses in a workers' compensation case. Exparte Alabama Ins. Guar. Ass'n, 667 So.2d [97] at 101 [(Ala. 1995)]." Mayfield Trucking Co., 724 So.2d at 24. However, our review of a case involving a purely legal issue is without a presumption of correctness. See § 25-5-81(e)(1), Ala. Code 1975;McGhee v. International Paper Co., 729 So.2d 880, 881
(Ala.Civ.App. 1999).
Two subsections of § 25-5-57(a), Ala. Code 1975, are at issue in this case: subsection (3), which the Legislature has entitled "Permanent Partial Disability," and subsection (4), which the Legislature has entitled "Permanent Total Disability." Consistent with its title, subsection (3) addresses the issue of compensation for employees who suffer from a permanent partial
disability, and, consistent with this stated scope, it contains a paragraph that is entitled, and that addresses, the "Effect of Refusal of Suitable Employment" by such an employee. § 25-5-57(a)(3)e. Likewise, consistent with its title, subsection (4) addresses the issue of compensation for employees who are permanently totally disabled; it contains a provision that addresses the consequences of such an employee's refusal to undergo physical or vocational rehabilitation (or to accept a reasonable workplace accommodation).
Paragraph e. of subsection (3) of § 25-5-57(a) reads in its entirety:
 "Effect of Refusal of Suitable Employment. If an injured employee refuses employment suitable to his or her capacity offered to or procured for him or her, he or she shall not be entitled to any compensation at any time during the continuance of the refusal, unless at any *Page 1064 
time, in the opinion of the judge of the circuit court of the county of his or her residence, the refusal is justifiable."
(Emphasis added.) We conclude that this provision applies not to employees who are totally disabled, but only to those who suffer from a permanent partial disability.
As already noted, § 25-5-57(a)(3)e. is found within a subsection of the statute that our Legislature entitled "Permanent Partial Disability." More significantly, the wording of § 25-5-57(a)(3)e. makes it clear that that statute does not apply to employees who are totally disabled. Instead, as worded, § 25-5-57(a)(3)e. presumes that the employee governed by its provisions has been determined to be partially disabled. Specifically, the statute presumes that an employee to whom it is applicable has been determined to have the "capacity" to work in some "suitable employment." For an employee who has been determined to be totally disabled, no job offered could be considered "suitable employment." See § 25-5-57(a)(4)d., Ala. Code 1975 (defining "permanent total disability" as an injury or impairment that "permanently and totally incapacitates the employee from working at and being retrained for gainful employment").
As noted above, § 25-5-57(a)(4) addresses the issue of compensation for employees who suffer from "permanent total disability." Quite logically, therefore, the Legislature has not included in § 25-5-57(a)(4) any provision comparable to paragraph e. of § 25-5-57(a)(3). A provision requiring employees to accept "suitable employment" would have no room for operation as to employees that have been determined to be totally disabled and, therefore, for whom there is no "suitable employment." SeeTAJ-Rack Div., Inc. v. Harris, 603 So.2d 1061, 1064
(Ala.Civ.App. 1992) (noting that permanent total disability is properly defined as "the inability to perform one's trade and the inability to find gainful employment").
Moreover, workers' compensation law in Alabama is a creature of statute. See Slagle v. Reynolds Metals Co., 344 So.2d 1216
(Ala. 1977). Unlike § 25-5-57(a)(3), § 25-5-57(a)(4) simply does not include an exception to an employee's entitlement to total-disability benefits based upon the receipt and refusal of a job offer.
What the Legislature did include in § 25-5-57(a)(4), however, is a provision that, as worded, is uniquely applicable to employees who, but for the ability to be retrained (or to be specially accommodated by their employer) would be totally disabled. The last sentence of § 25-5-57(a)(4)d. states: "Any employee whose disability results from an injury or impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled." This provision obviously was meant to apply to employees who, after having reached MMI, see Ex parte Phenix Rental Center, 873 So.2d 226
(Ala. 2003), are incapable of engaging in gainful employment before undergoing any physical or vocational rehabilitation but who would have some degree of capacity to engage in gainful employment if they were to undergo physical or vocational rehabilitation. Pursuant to § 25-5-57(a)(4)d., such an employee may not attempt to keep himself or herself in a position to continue receiving total-disability benefits by simply refusing to undergo rehabilitation that would increase his or her capacity to work to a point that he or she would no longer be totally incapacitated from working at gainful employment.
The last sentence of paragraph d. of § 25-5-57(a)(4) clearly applies only to those employees who are totally disabled. First, as noted, it is in that section of *Page 1065 
the statute entitled by the Legislature "Permanent Total
Disability." More significantly, the language used by the Legislature makes it clear that this sentence applies to totally disabled employees. Finally, the sanction imposed by this provision for an employee's refusal to undergo rehabilitation is the disqualification of the employee from receivingtotal-disability benefits. If the employee were not totally disabled in the first instance (that is, in the absence of rehabilitation) the only sanction levied by the statute would be no sanction at all.
Thus, while subsections (3) and (4) of § 25-5-57(a) contain limiting provisions that create exceptions to an employee's entitlement to compensation benefits, those limitations are uniquely applicable to the respective sections in which the Legislature has placed them.
As noted, the employers argue that the employee's rejection of jobs they contend the employee could perform constituted a refusal of "rehabilitation." "Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning," however. IMED Corp. v. Systems Eng'g Assocs. Corp.,602 So.2d 344, 346 (Ala. 1992). Merely locating jobs that purportedly correspond with an employee's post-MMI work capacity simply does not increase that work capacity. (Instead, evidence that there are jobs available that could be performed by the employee would go to the threshold issue of whether the employee was, in actuality, totally disabled in the first place.)
In the present case, the trial court found that the employee could not perform the jobs located by his former employers (even if the employee had been offered them) and that the employee therefore was totally disabled. The fact that the record before us contains evidence, introduced by the employers, that certain jobs were available and that the employee was capable of performing those jobs might be used to argue that the trial court's factual finding that the employee was totally disabled was contrary to the evidence. The employers do not rely upon that evidence for that purpose, however. That is, the employers do not argue on appeal that the trial court's factual finding that the employee was totally disabled was not supported by substantial evidence or was contrary to the great weight of the evidence; therefore, such factual issues are not before us.
Instead, the employers rely upon the evidence of various job openings to make a purely legal argument. The employers argue that the failure of the employee to cooperate with the employers' efforts to arrange interviews for those jobs (a) was equivalent, for purposes of the statute, to refusing actual job offers and (b) that those "refusals" prevented the trial court, as a matterof law, from finding the employee totally disabled. Evenassuming for the sake of argument the validity of the propositionin (a), merely because a former employer has been able to locate another employer who is willing to interview the employee for a prospective job does not mean, and cannot mean, that as a matter of law the employee is capable of performing that job. To so hold would deprive the trial court of its statutorily prescribed role as the arbiter in workers' compensation cases. It would preempt the trial court from making findings that the employee is not capable of performing the job that is the subject of the prospective job interview (i.e., that the employee's refusal to attend that job interview is justified). It would tend to make the arranging of a job interview for an employee tantamount to a determination that the employee is capable of performing the job in question. *Page 1066 
In sum, the employers do not challenge the sufficiency or the weight of the evidence as it relates to the trial court's factual finding that the employee was incapable of performing the jobs at issue. The purely legal argument that the employers make instead is not in accord with the statutory scheme plainly prescribed by our Legislature. While an employer's locating a job for a disabled employee might be helpful in returning to the workforce an employee who is otherwise capable of and engaged in physical or vocational rehabilitation, the location of a potential job, standing alone, does not as a matter of law constitute "rehabilitation" of an employee found by a trial court to be totally disabled.
On the basis of the foregoing, we must affirm the trial court's judgment.
The appellee's request for the award of an attorney fee on appeal is denied.
AFFIRMED.
YATES, P.J., and THOMPSON, J., concur.
PITTMAN, J., dissents, with writing, which CRAWLEY, J., joins.
[2] The employers have conceded that Skilstaf, Inc., was the employee's "general employer" and that Clear Creek Transportation, Inc., was the employee's "special employer." Seegenerally Terry v. Read Steel Prods., 430 So.2d 862, 865 (Ala. 1983).
[3] The employers also have challenged the sufficiency of the trial court's findings and conclusions under § 25-5-88, Ala. Code 1975; however, while the trial court does treat certain issues in a somewhat summary fashion in its five-page judgment, that court substantially complied with that statute so as to warrant our review on the merits. See Dees v. Daleville Florist,408 So.2d 155, 156 (Ala.Civ.App. 1981) ("Substantial compliance with [§25-5-88] will suffice.").