BRYAN, Judge.
McWane, Inc., appeals from the trial court’s judgment awarding Donald P. McClurg permanent-total-disability benefits under the Alabama Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975 (“the Act”). We affirm.
McClurg worked as an maintenance electrician for McWane, a company that produces cast-iron pipe. On October 25, 2005, McClurg was injured in a workplace accident in which he was crushed between a pipe aligner and a pipe. In the accident, McClurg sustained fractures to several bones on the right part of his upper body, a punctured liver, contusions, and nerve damage. Following the accident, McClurg received extensive medical treatment for his injuries, and he did not return to work.
McClurg subsequently sued McWane, seeking workers’ compensation benefits. McWane filed an answer denying the material allegations of the complaint and asserting various affirmative defenses, including the defense of willful misconduct. In August 2008, the trial court held a trial at which it received oral testimony and documentary evidence. In October 2008, the trial court entered a judgment awarding McClurg permanent-total-disability benefits as a result of the injuries caused by the workplace accident. The trial court noted that, “[sjince the [accident, McClurg] has suffered from constant pain, severe sleep disorder, physical disabilities and mental problems.” McWane filed a postjudgment motion to alter, amend, or vacate the judgment, and, in January 2009, the trial court entered an amended judgment slightly modifying the original judgment. McWane subsequently filed a timely notice of appeal to this court.

Standard of Review

Section 25-5-81(e), Ala.Code 1975, provides the standard of review in workers’ compensation cases:
“(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
“(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.”
Substantial evidence is “‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’” Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life *51 Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).
“Our review is restricted to a determination of whether the trial court’s factual findings are supported by substantial evidence. Ala.Code 1975, § 25-5-81(e)(2). This statutorily mandated scope of review does not permit this court to reverse the trial court’s judgment abased on a particular factual finding on the ground that substantial evidence supports a contrary factual finding; rather, it permits this court to reverse the trial court’s judgment only if its factual finding is not supported by substantial evidence. See Ex parte M & D Mech. Contractors, Inc., 725 So.2d 292 (Ala.1998). A trial court’s findings of fact on conflicting evidence are conclusive if they are supported by substantial evidence. Edwards v. Jesse Stutts, Inc., 655 So.2d 1012 (Ala.Civ.App.1995).”
Landers v. Lowe’s Home Ctrs., Inc., 14 So.3d 144, 151 (Ala.Civ.App.2007) (opinion on original submission). The “appellate court must view the facts in the light most favorable to the findings of. the trial court.” Ex parte Professional Bus. Owners Ass’n Workers’ Comp. Fund, 867 So.2d 1099, 1102 (Ala.2003).

Discussion

I.

On appeal, McWane first argues that the trial court erred in awarding compensation to McClurg because, McWane says, McClurg’s injuries were caused by his willful misconduct. More specifically, McWane argues that McClurg committed willful misconduct by failing to follow McWane’s “lockout/tagout procedure,” which we will discuss below. Section 25-5-51, Ala.Code 1975, provides that “no compensation shall be allowed for an injury or death caused by the willful misconduct of the employee.” Willful misconduct is an affirmative defense, Ex parte Bowater, Inc., 772 So.2d 1181, 1181-82 (Ala.2000); an employer bears the burden of proving that an employee’s willful conduct caused the alleged injury. § 25-5-36, Ala. Code 1975.
In Musgrove Construction, Inc. v. Malley, 912 So.2d 227, 234-35 (Ala.Civ.App.2003), this court discussed the defense of willful misconduct:
“Both our supreme court and this court have considered the application of the ‘willful misconduct’ bar in several cases. One of the earlier cases that discussed the application of the willful-misconduct bar adopted the view that ‘the mere violation of rules, when not willful or intentional, is not “willful misconduct” within the meaning of the law.’ Ex parte Woodward Iron Co., 212 Ala. 220, 225, 102 So. 103, 107 (1924). The court further explained that ‘the phrase “willful misconduct,” as used in the [Workmen’s Compensation Act], includes all conscious or intentional violations of definite law or definitely prescribed rules of conduct, as to which obedience is not discretionary, as contra-distinguished from inadvertent, unconscious, or involuntary violations thereof.’ Ex parte Woodward Iron, 212 Ala. at 223, 102 So. at 105-06.
“As questions arose as to what exactly constituted a ‘willful’ violation of a law or rule, the supreme court explained that ‘[t]he test is not the doing of an act for the purpose and with the specific intent of violating a rule, but the willful and conscious doing of the act which is in violation of the reasonable rule known to the [worker].’ Sloss-Sheffield Steel & Iron Co. v. Greer, 216 Ala. 267, 270, 113 So. 271, 273 (1927). The court explained that a worker may be guilty of willful misconduct without having an intent to break the rule, that is, without having ‘thought or deliberated as to the rule *52 and its breach.’ Greer, 216 Ala. at 269, 113 So. at 273. Specifically, the court commented that an employer, to establish that a worker was guilty of willful misconduct, should show:
“ ‘that the [worker] intentionally did an act which is in violation of a known and reasonable rule, that was known to the [worker], and that the act was with a knowledge and appreciation on the part of the [worker], of what that violation involved, and the natural and probable result of the misconduct in the premises.’
“Id. The court summed up its discussion by stating that ‘[i]f, then, the [worker] knows the rule, and the natural, probable, and serious result of its violation and with such knowledge does the act of violation, such act is deliberately done and is willful misconduct.’ Greer, 216 Ala. at 270, 113 So. at 273.
“The supreme court further explained the concept of a ‘willful’ violation of a law or rule in Sloss-Sheffield Steel & Iron Co. v. Nations, 236 Ala. 571, 183 So. 871 (1938). The court first commented that Greer had held that the employer need not show that the worker ‘was thinking of the rule at the time, and entertained the specific intent to violate it.’ Nations, 236 Ala. at 575, 183 So. at 873. The court then went further to define ‘willful,’ stating:
“ ‘ “ ‘Willful,’ as used in the statute, imports something more than a mere exercise of the will in doing the act. It imports a wrongful intention. An intention to do an act that [the worker] knows, or ought to know, is wrongful or forbidden by law. It involves the idea of a premeditation and determination to do the act, though known to be forbidden.” ’
“Id. (quoting King v. Empire Collieries Co., 148 Va. 585, 590, 139 S.E. 478, 479 (1927)). The court further noted that the Virginia court had commented that a willful failure or refusal involved more than mere ignorant failure to comply with a rule or statute. Id. Finally, the court held that ‘what amounts to a willful failure or refusal to comply with a [rule or law] is dependent upon the circumstances, and [is] to be determined upon the particular facts of each case.’ Nations, 236 Ala. at 575, 183 So. at 874.
“... The most recent case to mention the willful-misconduct bar fails to discuss its application at length. See Ex parte Holton, 886 So.2d 83, 86-87 (Ala.2003). However, that opinion does give a definition of the word ‘willful’: ‘ “The usual meaning assigned to ‘willful,’ ... is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.”’ Ex parte Holton, 886 So.2d at 87 n. 4 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 344 at 213 (5th ed. 1984)).
“Thus, to summarize over 75 years of law on the willful-misconduct bar, a worker commits willful misconduct involving a violation of an employer’s rule or regulation when the worker knows that rule, he understands the consequences of disobeying that rule, he deliberately chooses to disobey the rule, and his choice to disobey that rule is unreasonable under the circumstances, as explained in Ex parte Holton, 886 So.2d at 87 n. 4.”
The following facts are pertinent to McWane’s willful-misconduct defense. On the date of McClurg’s accident, a supervisor directed McClurg to investigate a problem with a pipe aligner. A pipe alig *53 ner is a machine that aligns a pipe as it travels on a rail in front of the pipe aligner. After being aligned by the pipe aligner, the pipe then enters into a test press, which subjects the pipe to air-pressure testing. The working end of the pipe aligner is flush with a guardrail standing three to four feet high. When in operation, the working end of the pipe aligner projects a piston that extends beyond the guardrail and engages the end of the pipe to align it. The pipe aligner is operated from an area behind the guardrail. The area beyond the guardrail, where the rail carries the pipe past the pipe aligner, is referred to as the “pipe testing line.” The part of the rail nearest to the pipe aligner is located about three feet from the guardrail.
At trial, McClurg testified that the pipe aligner was not operating when he arrived to inspect it. McClurg testified that he pressed an “E-stop” button on the control panel of the pipe aligner. McClurg stated that he believed that pressing the E-stop button would prevent the pipe aligner from operating.
In its judgment, the trial court discussed additional facts surrounding McClurg’s accident:
“[McClurg] testified that the procedure he knew to follow was to first make a visual inspection to attempt to determine the extent of the problem, so as to inform the supervisor of the estimated time that the [pipe aligner] would be down for repairs. Upon completing the visual inspection and reporting to the supervisor, the [pipe aligner] would be locked out and tagged out[, i.e., the energy sources supplying the pipe aligner would be cut.]
“[McClurg] also testified that he made a visual inspection of the electrical wiring beneath both the control panel and the wiring of the pipe aligner, which was in close proximity to the control panel....
“[McClurg] never left the ‘aisle’ side of the [guardrail] and did not attempt to approach the pipe testing line [on the other side of the guardrail] in any way during his visual inspection.
“[McClurg] testified he remembers standing beside the pipe aligner' looking at a wire that ran from a sensor which was mounted on a rail beneath the pipes to the pipe aligner. The next thing he recalls is hearing his bones ‘crunch.’ His next recollection is being in the hospital. ...”
Charles Fisher, the operator of the press-test machine adjacent to the pipe aligner, observed McClurg’s accident. The trial court stated:
“[Fisher] testified that [McClurg] remained on the ‘aisle’ side of the [guardrail] and away from the pipe áligner at all times. [McClurg] never crossed over the [guardrail] in the direction of the pipe test line. Mr. Fisher saw [McClurg] reach over the [guardrail] and ‘jiggle’ a wire. At that time, the pipe aligner machine was not operating. After [McClurg] jiggled the wire, the pipe aligner started working, grabbed [McClurg] and squeezed [him] between the pipe aligner and the end of a pipe.”
Fisher also testified that, at the time of the accident, McClurg was “inspecting” the pipe aligner and had not begun to make any “repairs.” McClurg also testified that he had not begun any actual “repair work” on the aligner when he was injured.
McWane argues that McClurg committed willful misconduct because, McWane says, McClurg failed to follow McWane’s “lockout/tagout procedure.” The record on appeal does not contain a specific procedure labeled as the “lockout/tagout procedure.” However, the record does contain a document entitled. “Safety Quiz- *54 Lockout Tagout 2005 B” (“the safety-quiz”). McClurg signed the safety quiz on October 4, 2005, three weeks before his accident. The safety quiz contains the following statement that McWane presents as containing the lockout/tagout procedure that McClurg allegedly violated: “I understand that I have been trained to protect myself by not reaching into (breaking the plane) on any machinery until I have personally locked out all sources of energy and ensured that the machinery controls have been disabled.” For purposes of this opinion, we will refer to the procedure referenced in the above statement as “the lockout/tagout procedure” that McWane argues McClurg violated.
McWane contends that McClurg violated the lockout/tagout procedure by leaning over the guardrail to place himself in front of the piston of the pipe aligner without first locking out the energy sources supplying the pipe aligner. It is undisputed that McClurg did not lock out the energy sources supplying the pipe aligner and that he would not have been injured had he done so. The trial court made factual findings regarding McClurg’s precise location at the time of his accident. In its judgment, the trial court first found that “[McClurg] never left the ‘aisle’ side of the [guardrail] and did not attempt to approach the pipe testing line [on the other side of the guardrail] in any way during his visual inspection.” However, the trial court also stated: “Mr. Fisher saw [McClurg] reach over the [guardrail] and ‘jiggle’ a wire.... After [McClurg] jiggled the wire, the pipe aligner started working, grabbed [McClurg] and squeezed [him] between the pipe aligner and the end of a pipe.” Reading these factual findings together, it appears that the trial court found that, at the time of the accident, McClurg stood on the “aisle” side of the guardrail but leaned over the guardrail to “jiggle” a wire. Fisher’s testimony regarding the accident constitutes substantial evidence supporting such a finding. Thus, the question is whether McClurg’s leaning over the guardrail to jiggle a wire in front of the pipe aligner without first locking out the energy sources supplying the pipe aligner constitutes a violation of the lockout/tagout procedure that rises to the level of willful misconduct.
In its judgment, the trial court summarily concluded that McClurg’s actions did not constitute willful misconduct. The trial court did not address the more specific factual issue whether McClurg’s reaching over the guardrail in front of the pipe aligner to jiggle a wire amounted to “reaching into” the pipe aligner or “breaking the plane” of the pipe aligner under the lockout/tagout procedure, as argued by McWane. Assuming, without deciding, that the evidence indicates that McClurg’s reaching over the guardrail technically violated the lockout/tagout procedure, that violation does not constitute willful misconduct. As noted, “‘the mere violation of rules, when not willful or intentional, is not “willful misconduct” within the meaning of the law.’” Malley, 912 So.2d at 234 (quoting Ex parte Woodward Iron Co., 212 Ala. 220, 225, 102 So. 103, 107 (1924)).
“ ‘ “The usual meaning assigned to ‘willful,’ ... is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.” ’ ”
Id. at 235 (quoting Ex parte Holton, 886 So.2d 83, 87 n. 4 (Ala.2003), quoting in turn W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 344 at 213 (5th ed. 1984)).
*55 In this case, the pipe aligner was not operating when McClurg reached over the guardrail to jiggle the wire. McClurg testified that, before he reached over the guardrail, he had. pressed the E-stop button, which he believed would prevent the operation of the pipe aligner. Moreover, Fisher testified that, at the time of the accident, McClurg was simply inspecting the pipe aligner, attempting to determine the source of the problem; both Fisher and McClurg testified that McClurg had not begun to “repair” the pipe aligner. Given the circumstances of this case, the trial court could have found that McClurg’s actions were not “ ‘ “of .an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow.” ’ ” Id.
McWane argues that this case is controlled by Ex parte Bowater, Inc., supra. In Ex parte Bowater,
“[Patrick Maze] placed his left hand, into a running conveyor system to dislodge a piece of wood that had jammed the system. When he dislodged the wood, the conveyor system immediately began moving; Maze’s hand was pinched between the wood and the top of the conveyor housing and was severely injured.”
772 So.2d at 1181. Maze sued for workers’ compensation benefits, and Bowater, his employer, asserted the affirmative defense of willful misconduct. Id. at 1181-82. The trial court entered a judgment in favor of Bowater on the ground of willful misconduct, but this court reversed the judgment of the trial court.. Id. at 1182. Our supreme court then reversed this court’s judgment, determining that the trial court had not erred in finding that Maze had committed willful misconduct. Id. at 1183. Our supreme court explained:
“At the time of Maze’s injury, Bowa-ter had a safety rule known as the ‘lockout procedure.’ The lock-out procedure required every employee, before doing any kind of maintenance or placing any body part inside a machine, to turn off the machine and lock it with a padlock so that it could, not begin moving or operating. Bowater issued each employee, including Maze, a padlock for this stated purpose. Employees were given a copy of the employees’ handbook, which contained a description of the lock-out procedure. Employees were disciplined for not following the lock-out procedure. The employees, including Maze, were told that the lockout procedure was important and was a mandatory part of the company’s safety program. They were told that they could lose their jobs for not following the lock-out procedure.”
772 So.2d at 1182.
The evidence in Ex parte Bowater indicated that Maze was well aware of the lock-out procedure and that that procedure applied to the conduct that caused his accident. “Maze admitted that he knew, at the time of the injury, that the safety rules required him to lock out the conveyor before attempting to remove the lodged piece of wood.” 772 So.2d at 1182-83. Our supreme court concluded that “[flair-minded and impartial persons could reasonably conclude from the evidence that Maze’s misconduct was willful and therefore barred his recovery under the Workers’ Compensation Act.” Id. at 1183.
This case is distinguishable from Ex parte Bowater. In Ex parte Bowater, Maze placed his hand into a “running conveyor system” to dislodge a jammed piece of wood. Id. at 1181. That action involved a “ ‘ “known or obvious risk that was so great as to make it highly probable that harm would follow.”’” Malley, 912 *56 So.2d at 235. Conversely, the pipe aligner in this case was not operating when McClurg leaned over the guardrail. Further, McClurg had pressed the E-stop button, believing that doing so would prevent the machine from operating. McClurg’s reaching over the guardrail to jiggle a wire in front of the pipe aligner does not entail the same type of obvious risk involved in Maze’s conduct in Ex parte Bowater. Moreover, unlike Maze’s testimony, although McClurg testified that he was aware that McWane had “a lockout and tagout procedure,” he never testified that he understood that that procedure prohibited his conduct in this case. McClurg’s conduct was not the sort of conduct contemplated by the willful-misconduct defense. At most, McClurg’s actions amounted to negligence. An employee’s mere negligence, however, will not bar an award of compensation under the Act. See § 25-5-51, Ala.Code 1975 (providing that an employer must pay compensation for its employee’s injury that is caused by “an accident arising out of and in the course of his or her employment, without regard to any question of negligence”).

II.

Next, McWane argues that the trial court erred by failing to find that McClurg had unreasonably refused to accept medical services. Section 25 — 5—77(b), Ala.Code 1975, provides, in pertinent part:
“If the injured employee refuses to comply with reasonable request for examination, or refuses to accept the medical service or physical rehabilitation, which the employer elects to furnish under this chapter, the employee’s right to compensation shall be suspended and no compensation shall be payable for the period of the refusal.”
McWane contends that McClurg unreasonably failed to continue systematic desensitization treatment with Dr. Delisa A. West, a neuropsychologist authorized by McWane to treat McClurg following his October 25, 2005, accident. Dr. West began treating McClurg in December 2005. She initially diagnosed McClurg as suffering from post-traumatic stress disorder (“PTSD”) caused by his work-related accident. Dr. West later diagnosed McClurg as also suffering from major depressive disorder. The record indicates that, between December 2005 and April 2008, Dr. West treated McClurg 28 times. Dr. West was still treating McClurg at the time of the trial in August 2008.
Dr. West used various methods to treat McClurg’s PTSD, including individual therapy sessions, relaxation exercises, deep-breathing exercises, visualization exercises, and systematic desensitization treatment. Systematic desensitization treatment involves incrementally exposing a patient to anxiety-causing situations. In McClurg’s case, the treatment involved visiting McWane’s plant, the site of his accident. Dr. West described systematic desensitization treatment as a “coping strategy” for PTSD, not as a “cure.” On February 20, 2006, as part of McClurg’s systematic desensitization treatment, Dr. West and McClurg visited McWane’s plant. Although McClurg did not visit the pipe aligner where the accident occurred, he did visit other parts of the plant. In her notes of that treatment, Dr. West observed that McClurg experienced some anxiety during the visit and that “[ojverall, Mr. McClurg did very well with his first graded visit [to the plant].”
On February 24, 2006, McClurg visited the McWane plant again as part of his systematic desensitization treatment. According to Dr. West’s treatment notes, McClurg “took graded steps further into the plant and approached the pipe ovens.... He experienced a substantial *57 increase in anxiety....” At trial, Dr. West testified that MeClurg became so anxious during the visit that his “whole body was shaking.” Following McClurg’s second visit to the plant, Dr. West’s treatment notes indicate that she delayed scheduling another visit to the plant until MeClurg could be evaluated by a psychiatrist. In late April 2006, MeClurg was treated by a psychiatrist, who prescribed several medications to MeClurg.
In May 2006, MeClurg, by himself, visited the McWane plant, where he interviewed for an office position. According to Dr. West’s notes, MeClurg later reported to Dr. West that he experienced “a substantial amount of anxiety” during that trip to the plant. In subsequent therapy sessions with Dr. West, MeClurg reported continued anxiety, emotional distress, and disturbances in sleep. In her notes dated July 18, 2006, Dr. West stated:
“We discussed whether [MeClurg] felt that return to his work site (his previous job or other light-duty opportunities) were goals that he felt comfortable working towards. He reported concern over his emotional ability to successfully be at the plant for extended amounts of time.... From an emotional standpoint, Mr. MeClurg has reached maximum medical improvement in regards to return to work at the pipe plant.”
It appears that, as of July 18, 2006, McClurg’s systematic desensitization treatment was abandoned. Dr. West continued to treat MeClurg using other methods.
McWane cites the following deposition testimony by Dr. West as evidence that MeClurg “refused” to continue his systematic desensitization treatment, thus barring an award of compensation for the period of refusal under § 25 — 5—77(b):
“Q. [By counsel for McWane:] ... [D]id you recommend to [MeClurg] that he not stop [systematic desensitization treatment]....
“A. I never recommend to not try. My philosophy is to try as many interventions as we can to help somebody get their life back on track. So, for him deciding not to want to try that treatment, that was his decision. I strongly encourage many different avenues to help.
“Q. So, for the record, you offered further systematic desensitization to Mr. MeClurg and he refused it, is that what you’re telling us?
“A. Yes.”
McWane also cites Dr. West’s testimony at trial:
“Q. [By counsel for McWane:] Mr. MeClurg made a decision that he did not want to follow your recommended [systematic desensitization] treatment; isn’t that correct, Doctor?
“A. Yes.
[[Image here]]
“Q. You recommended that he continue [systematic desensitization treatment], did you not, Doctor?
“A. Yes.
“Q. And he did not choose to accept that recommendation, correct?
“A. Yes....”
However, at trial Dr. West explained her response in which she had agreed that MeClurg had chosen not to continue systematic desensitization treatment:
“A. Yes, he decided not to do those treatments, but it wasn’t a defiance type of attitude or I don’t want to try, it was I have gotten to the point where I can’t go anymore, that this was too difficult. So it wasn’t a dismissive type of reaction; it was a I can’t do it type of feeling. Even though he has made strides, it wasn’t a dismissive, negative *58 type of refusal. It was a he had reached where he thought he could go.
“Q. [By counsel for MeWane:] Where he thought he could go. But that certainty wasn’t where you wanted to take him?
“A. Therapy is a two-person street.
[[Image here]]
“Q. [McClurg’s deciding not to continue systematic desensitization treatment] was not what you were recommending?
“A. I was recommending that we decide what we were going to do.
[[Image here]]
“Q. [By counsel for McClurg:] And I want to also ask you to elaborate on your statement that [McClurg] was not defiant in the statements, in the decisions he made while he was under your treatment.
“A. Yeah. I guess I’m struggling with the word ‘refused.’ You know, I didn’t take it, knowing him as well as I do, that he was refusing. He had gotten to a point where he knew he couldn’t do more.”
When asked at trial about the possibility of future systematic desensitization treatment involving McClurg visiting McWane’s plant, Dr. West testified: “At this point, I think his anxiety levels would be so great, similar, if not more than when we ... got close to the ovens that one visit. With this amount of time that has passed, it’s really difficult to see that those trips would make [his condition] better.”
In her deposition testimony, Dr. West testified:
“Q. [By counsel for McClurg:] Was [McClurg’s] anxiety ... one of the reasons why there [were] no further attempts to schedule a third plant visit for ... McClurg?
[[Image here]]
“A. The reason we did not go back was because of his anxiety level and feeling like it would continue to ... increase his anxiety with return.”
Dr. West further testified in her deposition:
“Q. [By counsel for McClurg:] Would you please now explain your full answer to whether or not ... McClurg refused your suggestions for his [systematic desensitization treatment]?
[[Image here]]
“A. Yes. I wouldn’t use the word [‘]refused.[’] You know, we’ve had many conversations about the options and where we want to go. And he on many occasions relayed to me he felt he wasn’t able ... given the difficulties emotionally, the thoughts, the nightmares ... the symptoms to keep going through those particular site visits, plant visits, the thought of continuing to increase that level of anxiety, he just felt like he could not do it ... not in I’m not going to do it, but in an ability way. So, I don’t know if I would use [‘]refuse.[’]”
In its judgment, the trial court did not specifically address McWane’s argument that McClurg had refused treatment, pursuant to § 25-5-77(b). However, the trial court noted:
“A third trip [in which Dr. West and McClurg would visit McWane’s plant] was not planned, due to [Dr. West’s] observation that [McClurg’s] medications needed to be adjusted and due to his increased level of chronic anxiety. She describes this increased level of chronic anxiety as too great for [McClurg] to return to the plant.
“Dr. West' recalls that she never assigned any task which [McClurg] did not attempt. She found him to be compliant.... ”
*59 Dr. West testified that she did not consider McClurg as having “refused” the systematic desensitization treatment. Dr. West’s testimony suggests that that treatment was one of several treatment options made available to McClurg. McClurg participated in the systematic desensitization treatment up to a point, but he chose not to continue it due to the anxiety that it caused him. The totality of Dr. West’s testimony indicates that she was supportive of his decision not to pursue systematic desensitization treatment as a treatment option. Dr. West continued to treat McClurg using various other treatment methods after his last systematic desensitization treatment. Given Dr. West’s testimony, a fair-minded person in the exercise of impartial judgment could reasonably infer that McClurg did not “refuse” medical services in this case. Therefore, we cannot hold the trial court in error for failing to find that McClurg refused medical services pursuant to § 25-5-77(b). See § 25-5-81(e)(2); and Ex parte Trinity Indus., Inc., 680 So.2d at 268.

III.

Next, McWane argues that McClurg unreasonably refused to participate in vocational rehabilitation. Section 25-5-77, Ala.Code 1975, provides, in pertinent part:
“(c) If the employer so elects, the employee shall submit to and -undergo vocational rehabilitation at the employer’s expense through a vocational rehabilitation specialist....
“(d) If an employee refuses, without the consent of the court, to accept vocational rehabilitation at the employer’s request, the refusal shall result in loss of compensation for the period of refusal.”
Section 25-5-57(a)(4)d., Ala.Code 1975, provides, in pertinent part: “Any employee whose disability results from an injury or. impairment and who shall have refused to undergo physical or vocational rehabilitation or to accept reasonable accommodation shall not be deemed permanently and totally disabled.”
In 2006, Dr. West referred McClurg to the Alabama Department of Rehabilitation Services (“ADRS”) for McClurg to inquire about possible rehabilitation services. In May 2006, McClurg visited ADRS, where he was determined to be eligible for rehabilitation services. However, McClurg did not subsequently obtain rehabilitation services from ADRS or elsewhere.
In its judgment, the trial court found:
“[McClurg] is not a candidate for vocational rehabilitation....
[[Image here]]
“[Jo Spradling, a vocational expert who testified at trial,] agreed with Dr. West’s opinion that [McClurg] is not a viable candidate for vocational rehabilitation.
[[Image here]]
“The cumulative effect of [MeClurg’s] physical and mental condition along with his limited educational and experiential background render him unsuitable- for vocational retraining.... He has not been offered specific rehabilitation plans, physical or vocational, nor has he refused any such as defined in the Act.”
The record contains conflicting evidence regarding McClurg’s suitability for vocational rehabilitation. The trial court had before it some evidence indicating that McClurg would be a viable candidate for vocational rehabilitation. However, at trial, ■ Dr. West testified that McClurg is not a candidate for vocational rehabilitation.[1] Jo Spradling, a vocational *60 expert, also testified that McClurg is not a suitable candidate for vocational rehabilitation. Whether an employee may be rehabilitated is a question of fact for the trial court. Beatrice Foods Co. v. Gray, 431 So.2d 1299, 1300 (Ala.Civ.App.1988). An employee who is not suitable for vocational rehabilitation may refuse an employer’s request for vocational rehabilitation. See J.S. Walton & Co. v. Reeves, 396 So.2d 699, 702-03 (Ala.Civ.App.1981) (stating that an employee’s failure to participate in vocational rehabilitation did not preclude a compensation award when there was evidence indicating that attempting vocational rehabilitation would be futile). “A trial court’s findings of fact on conflicting evidence are conclusive if they are supported by substantial evidence.” Landers, 14 So.3d at 151. In this case, the trial court had before it substantial evidence indicating that McClurg is not a suitable candidate for vocational rehabilitation. Accordingly, the trial court did not err in failing to find that McClurg violated the Act by refusing vocational rehabilitation. See Reeves, supra.

IV.

Finally, McWane argues that § 25-5-57(a)(3)e., Ala.Code 1975, bars McClurg from receiving certain compensation. Section 25-5-57(a)(3)e. provides:
“Effect of Refusal of Suitable Employment. If an injured employee refuses employment suitable to his or her capacity offered to or procured for him or her, he or she shall not be entitled to any compensation at any time during the continuance of the refusal, unless at any time, in the opinion of the judge of the circuit court of the county of his or her residence, the refusal is justifiable.”
However, “[§ 25-5-57(a)(3)e.] applies not to employees who are totally disabled, but only to those who suffer from a permanent partial disability.” Clear Creek Transp., Inc. v. Peebles, 911 So.2d 1059, 1064 (Ala.Civ.App.2004). As noted, the trial court determined McClurg to be permanently and totally disabled. Therefore, § 25-5-57(a)(3)e. is inapplicable to this case, and McWane’s argument is without merit.

Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
MOORE, J., concurs in part and concurs in the result, with writing.

. Dr. West also testified that she had considered McClurg a candidate for vocational reha *60 bilitation during the early days of his treatment with her.